NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

RICKEL BROS., INC., Respondent.
No. 13474.

United States Court of Appeals
Third Circuit.

Argued April 4, 1961.

Decided May 15, 1961.

Marcel Mallet-Prevost, Washington, D. C. (Stuart Rothman, General Counsel, Dominick L. Manoli, Associate General Counsel, Melvin J. Welles, James A. Ryan, Attorneys, National Labor Relations Board, Washington, D. C., on the brief), for petitioner.

Jerome S. Lieb, Newark, N. J., Abraham I. Harkavy, Newark, N. J., of counsel (Harkavy & Lieb, Newark, N. J., on the brief), for respondent.

Before GOODRICH, McLAUGHLIN and HASTIE, Circuit Judges.

McLAUGHLIN, Circuit Judge.

Enforcement of the Board's order against the respondent employer is sought on the proposition that "The Board's conclusion in the circumstances of this case that the 'real reason' for Nicolas' discharge was not his alleged shortcomings as an employee, but his union activity, is, to say the least, 'a permissible conclusion.'"

The facts themselves are simple. Respondent operates retail stores at Union and Succasunna, New Jersey, selling paint, plumbing and related tools and supplies for "do-it-yourself" home maintenance repairs and construction. Strafford Nicolas was hired by respondent about December 8, 1958. He first worked at the Union store. In March 1959 he was transferred to Succasunna. He had been in the plumbing, heating, oil pumpers and sheet metal work business for himself from 1922 to 1955. He also worked a year in Reaction Motors. He said he was engaged by respondent because of his background. On cross-examination he stated he had special qualifications for selling plumbing and heating supplies. Then he was asked:

"Hadn't you been warned several times before August 22, Mr. Nicolas, that you had been making too many errors and were going to be let go if they continued?"

He answered:

"I had made a number of errors. I was never told I was going to be let go."

He was asked:

"From time to time during the eight odd months you were working for Rickel, weren't you called on on many occasions to make payment for under charges made by you to customers?"

He answered:

"Yes".

The Examiner in his intermediate report concedes those errors but would dispose of them as follows:

"However, it is clear that the Respondent did not sustain a financial loss as a result of these errors since the Respondent customarily deducted the amount of these undercharges from Nicolas' earnings and the customers reaped the benefit of such errors."

In the face of the above, the Examiner's only comment as to Nicolas' alleged inefficiency was: "It is obvious that the Respondent is grasping at weak reeds in its reliance on refunds as evidence of Nicolas' shortcomings."

In July 1959 there was quite a fuss over the sale by Nicolas of a kitchen cabinet with a special counter top to a Mr. Frey. Nicolas charged also for an ordinary top for which there should have been an allowance to the customer. In addition Nicolas had made special measurements for the cabinet at the customer's home.

This was contrary to store regulations. It made the top a custom job and as the measurements were wrong, the store had to correct the work at its expense. The Examiner's conclusion as to this was "Whether or not Nicolas acted improperly in connection with the Frey sale, it is significant that he was not reprimanded for his conduct, much less threatened with discharge."

Finally there occurred the Genaro incident. On August 21, 1959, Nicolas sold a Mr. Genaro a well pump which called for a particular jet assembly. The latter was not in stock. Nicolas, instead of telling Genaro the fact, gave him an unsuitable unit. The next day, August 22nd, Genaro made a special trip from Scranton, Pennsylvania, "came storming into the store" and returned the equipment. He refused to wait until the store obtained the proper jet assembly and had his money refunded. Nicolas was discharged later the same day, according to the manager, because of " * * * his past work habits and finally this Genaro incident,

that unfortunately, I couldn't continue him in our employ."

Meanwhile, since July 1959, Nicolas had been active with others in unionizing the store. On August 21, the same day he made the Genaro sale, he asked Miss Moeck, a store cashier, to join. She declined. He admittedly said that when she joined later she would have to pay an initiation fee. The Assistant Manager, Fleischman, testified she stated to him that Nicolas said to her "Well, why not get in on the gravy train. Otherwise, if you don't, if we do—if the union does come in, whichever it may be, why, you'll probably be penalized to this extent of paying an exorbitant initiation fee." Miss Moeck said she did not remember if Nicolas had told her that she would have to pay a high initiation fee if she didn't join then. The Examiner found that Nicolas told her that he supposed she just wanted "to get in on the gravy end of it." The Examiner concluded that Nicolas meant by this that Miss Moeck "probably desired the benefit of unionization without joining."

Miss Moeck told the Assistant Manager that Nicolas had solicited her membership and asked his advice whether or not to join. Fleischman advised her that she would have to make her own decision. After that he called the store employees together and said to them:

" * * * that under no consideration can anyone direct another to join any organization under coercion or under threat that they will be penalized in any respect.

" 'as far as each and every one of you is concerned,' I said, 'you will have to use your own free will. Do as you wish to. And that is all.' "

The Examiner concluded that the Assistant Manager's above quoted remarks " * * * plainly have more meaning than a simple explanation of employees' statutory rights. In my opinion, they reveal a subtle concern and dissatisfaction with union activity of the Respondent's employees, although the remarks themselves do not constitute unfair labor prac-

tices." He found that the respondent had violated Section 8(a) (3) and (1) of the Act, 29 U.S.C.A. § 158(a) (1, 3), by discharging Nicolas because of his union activity. Despite the fact that the Examiner specifically noted *"that the Respondent retained other union supporters in its employ"* he stated that *"Although Nicolas probably mishandled the Genaro sale,* I am persuaded that it was the recently acquired knowledge of Nicolas' union solicitation that precipitated his dismissal and that the Genaro incident was only a pretext to rid itself of an active union adherent."* (Emphasis supplied.)

The Board adopted the findings, conclusions and recommendations of the Examiner without comment. It seems to us that those findings and conclusions need pointed comment for they are not supported by substantial evidence on the whole case.

The only legitimate inference from the facts accepted by the Examiner is that respondent hired Nicolas because of his special experience. Thereafter he made a number of errors. During the eight months of his employment he was called on many times to make payment for his undercharges to customers. The Examiner, in some completely unjustified fashion, would eliminate that from consideration on the theory it did not cost respondent anything. This hardly sets up bench marks of its own in evaluating sound business methods. Aside from that respondent's type of selling heavily relies on the good will it establishes. Its tightly competitive field could ill afford repetitive pursuit of chronic mistakes. No one could continue to run such a store that way. Even so, management patience and hope regarding Nicolas seem reasonably indicated. The Examiner is exercised over the store's failure to threaten Nicolas with discharge. We do not see any fair deduction of satisfaction with the salesman from this. Nicolas knew he was making the mistakes. He swore that he had been called upon to reimburse for his undercharges many times. He possessed a long experience in the trade. He certainly must have realized that he could

not add to his worsening situation such acute incidents as Frey and Genaro and retain his position. At the very least lack of any evidence of his improvement affords no help to the Board in its effort to establish his employer's unfair labor practice as the cause of his discharge.

The Examiner states that the solicitation of Miss Moeck precipitated the discharge of Nicolas. Actually the record is plain that the sale of the faulty pump to Genaro the day prior to Nicolas approaching Miss Moeck, triggered the termination of his employment. Because of what had happened the day before Genaro stormed into the store and rightfully so; as the Examiner, not overstating the occurrence, puts it " * * * Nicolas probably mishandled the Genaro sale, * * *." It happened that Nicolas talked with Miss Moeck that same day but certainly the timing of the Genaro visit cannot be ascribed to any subtle planning by Respondent. It was brought about, precipitated by Nicolas' inexcusable conduct when as a salesman of a "do-it-yourself" appliance he deliberately or negligently gave the customer the wrong vital part. This was the culmination of eight months mistakes by Nicolas. It resulted in his discharge. That same day he had talked to Miss Moeck but other employees were also helping organize the store. According to the Assistant Manager, Miss Moeck had told him another salesman had solicited her with Nicolas. She testified that it was Nicolas alone who had requested her to join the union. But it was after talking to the Assistant Manager that she asked the other salesman for an application to join the union because she knew he had the applications. That man is still working in the Succasunna store.

■ Respondent could not lawfully discharge Nicolas because he was engaged in union organizational affairs. If it did so it was in violation of the Act. The burden of proving this affirmatively, however, is that of the Board. N. L. R. B. v. Rockwell Mfg. Co., 3 Cir., 1959, 271 F.2d 109, 115; N. L. R. B. v. McGahey, 5 Cir., 1956, 233 F.2d 406, 411;

Appalachian Electric Power Co. v. N. L. R. B., 4 Cir., 1938, 93 F.2d 985, 989.

■ The Board concedes, as it must, that it has no right to question whether or not an employer has good cause for discharging an employee, provided that the discharge is not motivated by the employee's exercise of his statutory rights. In this instance it first attempts to fulfil its assignment of establishing respondent's labor violation by taking the confessedly proper language of the Assistant Manager above quoted and by an unwarranted inference characterizing it as revealing a subtle concern and dissatisfaction with union activity of the employees. Fleischman, after listening to Miss Moeck's experience, told the employees' group it could not be coerced or threatened into joining any organization and said "As far as each and every one of you is concerned, * * * you will have to use your own free will. Do as you wish to. And that is all." This clear commitment would seem to have been carried out in good faith for again it is the Examiner with his findings adopted by the Board, who held that there was no discrimination by the respondent against other union supporters in its employ.

The Board has not produced substantial evidence that the discharge of Nicolas was based on his work for the union. Tested by that rule the conclusion it reached is not permissible. It is merely the result of allowing suspicion and prejudgment to substitute for the required proof. What Mr. Justice Douglas, speaking for the Court, said in Local 357, International Broth. of Teamsters, etc. v. N. L. R. B., 365 U.S. 667, 81 S.Ct. 835, 840, 6 L.Ed.2d 11, with respect to the union there concerned applies just as cogently to the employer in this case:

"We cannot assume that a union conducts its operations in violation of law or that the parties to this contract did not intend to adhere to its express language. Yet we would have to make those assumptions to agree with the Board that it is reasonable to infer the union will act discriminatorily."

The petition for enforcement of the Board's order will be denied.