**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**ACE COMB COMPANY and Ace Bowling Company, Division of Amerace Corporation, Respondents.**

**No. 17597.**

United States Court of Appeals
Eighth Circuit.
March 30, 1965.

Harold B. Shore, Atty., NLRB, Washington D. C., made argument for petitioner and filed brief with Arnold Ordman, Gen. Counsel, NLRB, Washington, D. C., Dominick I. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel and Allison W. Brown, Jr., Atty., NLRB, Washington D. C.

Frank M. Swift, of Smith, Swift, Currie, McGhee & Hancock, Atlanta, Ga., made argument for respondents and filed brief with J. H. Evans, Booneville, Ark.

Before MATTHES and RIDGE, Circuit Judges, and HANSON, District Judge.

RIDGE, Circuit Judge.

The National Labor Relations Board (Board) seeks enforcement of its order entered against respondents pursuant to § 10(e), National Labor Relations Act, as amended (Act) (29 U.S.C.A. § 151 et seq.) declaring violations of § 8(a) (1) of the Act, in that respondents' supervisory personnel had interrogated and threatened certain employees concerning their Union activities during the course of a Union organization drive; had solicited some employees to repudiate the Union; and a further violation of § 8 (a) (1) and (3) because of the discharge of one employee, George Woodliff, for Union activities.

The recommended order of the Trial Examiner declaring the above-stated matter to be unfair labor practices within the meaning of §§ (6) and (7) of the Act, supra, was adopted by the Board, and respondents were ordered to cease and desist from: (a) discouraging Union membership by discharging or otherwise discriminating against employees; (b) threatening employees because of their Union activities, coercively questioning them concerning Union matters, and soliciting repudiation of the Union; and (c) in any other manner interfering with or coercing employees in the exercise of their rights under § 7 of the Act (29 U.S.C.A. § 157). Affirmatively, respondents were ordered to offer reinstatement to employee Woodliff, ante, with back pay in part; to post the usual notices and notify the Board of their compliance with the foregoing.

### The 8(a) (1) violation.

Generally stated, the facts are these: In December 1961, the Union [1] began an organizing drive among respondents' employees. The drive was conducted by an international representative of the Union and one Newell Fletcher, a former employee of respondents. Two elections were held in that organizational drive, the first on March 21 and the second on May 31, 1962, both of which were lost by the Union. The result of the first election was set aside by the Board, and the second election was accordingly ordered.

The Examiner found that on three occasions before the first election, and during the month of March 1962, Night Foreman Bill Young made remarks to various employees concerning employees Hefley and Scott, to the effect that because they were active in Union organizing they would be fired after that Union election was held. They were not so fired. After the first election and about the middle of April 1962, another foreman, Earl Maxwell, had a conversation with employee Crowley at the latter's home, during which he interrogated Crowley concerning his own Union sympathies and the feelings of other employees. During this conversation, Maxwell intimated that Union sympathizers might find it difficult to obtain credit in town; and further hinted that employee Taylor was in danger of losing his job because of Union activities. Shortly before the second election, Foreman Young approached employee Tuckness and asked him to speak with two women employees about "changing their minds" and voting against the Union. The above facts were relied on by the Board for its determination that § 8(a) (1) was here violated.

Respondents attack the Board's decision that they violated § 8(a) (1) of the Act by interrogating and threatening employees and soliciting them to repudiate the Union on the ground that the same can only be found in isolated, sporadic and unauthorized statements of supervisory employees which are not sufficient to cause an employer to be found guilty of an unfair labor practice; citing N. L. R. B. v. Armour & Co., 213 F.2d 625 (5 Cir. 1954); N. L. R. B. v. Arthur Winer, Inc., 194 F.2d 370 (7 Cir. 1952); N. L. R. B. v. Appalachian E. Power Co., 140 F.2d 217 (4 Cir. 1944); N. L. R. B. v. Tennessee Coach Co., 191 F.2d 546 (6 Cir. 1951). While such cited authority

1. United Rubber, Cork, Linoleum and Plastic Workers of America, AFL–CIO.

contains abstract statements that support appellant's assertion supra, we do not consider the same to be applicable to the facts here. In the instant record, accredited testimony is found to the effect that three employees testified that Foreman Young stated on two different occasions that certain named employees who were Union sympathizers would be fired for their Union activities; and on another occasion, that "pressure" would be put on those employees for being Union men. Another employee testified that on two other occasions Young asked him to get certain other employees to change their minds about the Union and to vote against it in the second election. Foreman Young was not called as a witness before the Trial Examiner, nor did the Company in any other way attempt to rebut the above testimony.

██ Employee Crowley testified that he had two conversations with Foreman Maxwell concerning Union activities, in the course of which Maxwell attempted to induce Crowley to repudiate the Union, and further intimated that Union supporters might find it difficult to obtain credit in town in the future. It was Crowley's testimony that Maxwell inferred that employee Woodliff had been discharged because of his Union activities. Maxwell admitted the conversations with Crowley and that the subject of the Union in general was discussed, but denied any intention to cause Crowley to gain the specific inferences concerning which he testified. The Examiner chose to give weight to Crowley's testimony rather than Maxwell's, based on his observation of the witnesses appearing before him, and the Board adopted such finding. There is no question but that the matters of credibility of witnesses and the weight to be given to evidence are strictly for the trier of fact in these cases, and that this Court must accept the Examiner's decision regarding the above witness' testimony. N. L. R. B. v. Morrison Cafeteria Co., 311 F.2d 534 (8 Cir. 1963); Marshfield Steel Co. v. N. L. R. B., 324 F.2d 333 (8 Cir. 1963);

Laister-Kauffmann Aircraft Corp., 144 F.2d 9 (8 Cir. 1944).

Hence in the instant case there is accredited testimony to the effect that two of the Company's foremen made statements on several occasions to several different employees, which, when viewed in light of the Union activity and the situation then existing in respondents' plants, can fairly be characterized as threatening and coercive. This is particularly so when it is recalled that the statements ante are revealed as having been made during the period which might be characterized as being intense with Union organizational activity. Under such circumstances we do not believe that the above statements, though few in number, can be classified as "isolated and sporadic."

██ As to respondents' contention that not only were such statements unauthorized but they were actually contrary to specific instructions given to the supervisory employees, it need only be noted that such instructions are of no avail to relieve an employer from imputed liability for statements made by supervisors unless the instructions are also communicated to the employees. Otherwise, having clothed the supervisors with the employer's authority, the statements will naturally have a coercive effect, regardless of the fact that they are unauthorized. N. L. R. B. v. Solo Cup Company, 237 F.2d 521 (8 Cir. 1956). Thus, considering the record as a whole, we think there is substantial evidence here to support the Board's decision as to § 8(a) (1) violations.

### The 8(a) (3) violation.

A much more perplexing question is presented by the Board's determination that the discharge of employee Woodliff on February 12, 1962, prior to the first election, was discriminatory and that he was actually discharged because of his Union activities, in violation of § 8(a) (3) of the Act. It is and always has been the Company's position that Woodliff was discharged because of his insub-

ordinate attitude as reflected by his refusal to follow orders from his superiors.

Recapitulating salient facts in connection with Woodliff's discharge, it appears that on December 17, 1961, the Union organizers made their first trip into Boneville, which occurred on a Saturday, where Woodliff and the organizers engaged in a conversation of some duration on a public thoroughfare. At that time, Woodliff did not sign a Union authorization card but offered his help in the organizing drive. It was on January 13, 1962, that Woodliff signed a Union card. After joining the Union, Woodliff frequently talked to other employees in favor of the Union, including on one occasion Noble Rogers who later acted as an observer for the Company during the first election.

Woodliff had been employed by the Company on the night shift since June 1960, and had apparently performed his duties well. In October 1961, he requested a transfer to the day shift which was granted. He was assigned to operate the "warm-up mill," a job he had never performed before. In this operation Woodliff was required to heat batches of raw rubber to a consistency that could be worked, then transfer the same in small batches to a smaller mill; from which he released blank strips of rubber which were cut into desired lengths and thereafter traveled on a conveyor belt to a "calender" where combs were stamped therefrom. It was part of Woodliff's responsibility to control the speed of the operation so as to keep the calender supplied with rubber strips as needed, depending on the size of the blanks being formed. The speed of such operation was controlled by means of a calibrated rheostat. The prior warm-up mill operator who instructed Woodliff as to his duties, told him to keep the rheostat set between 45 and 55, depending on the size of the blanks being formed. Prior to Woodliff's assignment to that operation, there had been a long-standing dispute between those working on the above-mentioned production line and their super-visors as to how fast the warm-up mill should be operated, which caused a delegation of employees (including the then operator) to call on Plant Manager Olsen, in the summer of 1961, in protest to the speed-up of the operation; they received permission from Mr. Olsen to run the machine at a slower rate than Supervisor Wagner had ordered. Thereafter, some engineering improvements were made on the warm-up machine; after which Supervisor Wagner again began to demand faster settings. It appears that the relative speed of operation of that machine wholly depended on the size of the blanks for combs that were being run, and such operation affected production generally in respondents' comb plant.

Sometime in the latter part of January 1962, Supervisor Wagner, in the presence of Foreman Maxwell, complained to Woodliff he was running the machine too slow and told Woodliff that the machine should be running at a setting of 55 to 60, rather than 45. Woodliff stated that he could not keep up with the machine at that speed, to which Maxwell replied that he would have to, or else be replaced.

About the first of February, Wagner approached Manager Olsen to request that Woodliff be discharged. Olsen constrained Wagner to give Woodliff an additional two weeks in which to improve. Wagner's complaint at that time was, that due to Woodliff's slowness the entire calender crew was kept from finishing production in time to perform additional tasks required of them each day, and that Woodliff refused to obey his orders concerning that matter.

On February 8 and 12, 1962, Wagner again complained to Woodliff that he was not running the machine fast enough. On the latter date, Wagner accused Woodliff of deliberately disobeying his order to increase the speed of the machine. At that particular time it appears that Wagner set the rheostat on the warm-up machine that Woodliff was running, to increase the speed thereof, and as soon as Wagner left, Woodliff "set the rheostat down" to a lower speed. Upon reprimand by Wagner for so act-

ing, Woodliff replied that he could not run the machine any faster and that he did not wish to be pushed beyond what he was capable of doing. Thereupon, Woodliff was discharged. Another employee was summoned to take over the machine. It is noted by petitioner that this other employee made no changes in the rheostat setting at which Woodliff was running it, and that fact is seized upon by the Examiner and the Board as evidence establishing the real cause of Woodliff's discharge was not for insubordination but contra, for his Union affiliation, since no complaint was made by the management as to the rate of speed the relief employee operated the warm-up machine thereafter.

The evidence concerning the speeds at which the various operators ran the warm-up mill was somewhat in conflict and not quite clear. Nonetheless, the Examiner concluded that Woodliff *did operate the machine somewhat slower than other operators*. Regardless of this, however, there is no dispute that Wagner had been attempting to speed up production, and this, long prior to the advent of the Union here considered. In this connection, it is noted that in the past when Wagner instructed the employees to run the machine faster than they considered feasible, they took the normal step of complaining to the proper authority concerning their grievance, rather than simply refusing to obey, as in the case of Woodliff. In the light of the foregoing, the Trial Examiner in the case at bar found:

"Under all the circumstances of (this) case, and particularly the fact that Wagner, long before the advent of the Union, had been attempting to get the warmup mill operators to run the calender at a faster speed, I find Woodliff's attitude on this occasion (February 12th when he was fired) was such as to justify Wagner in taking some action with respect to Woodliff."

He nevertheless found "that the Company discharged Woodliff for reasons pro-

hibited by Section 8(a) (3) of the Act." Seemingly, a premise therefor was:

"Wagner's taking the drastic action of discharge in response to Woodliff's protests that he could not run the calender any faster appears * * * to be so out of proportion to the situation calling for redress (the Examiner concluded) Wagner must have had other motives in discharging Woodliff."

This, in the light of this injudicious finding made by the Examiner that:

"While I have found that the Company's discharge of Woodliff at this time (violated the Act) this does not mean that the Company's (sic) henceforth precluded from taking action * * * including * * * discharging him. * * *"

That is to say, if Woodliff is reinstated and he continues to operate the warm-up machine at the same rate of speed he did before he was discharged, it will be legally rightful for the respondents to discharge him again.

Hence, the Examiner's conclusion that the discharge of Woodliff was in violation of the Act here wholly rests on inferences to be made from the facts, ante; that an organizational campaign was going on at the time when Woodliff was discharged; that Woodliff participated in the campaign; and that the Company must have been aware thereof, and this solely premised on a subsequent remark made by Foreman Wagner and one other foreman, after Woodliff's discharge as above related. When the testimony in this record is fairly examined and weighed, it appears that it is because the Trial Examiner concluded that Woodliff's discharge was too severe an action to take in view of the character of his offense ante, and because subsequent operators apparently were allowed to continue to operate the warm-up machine at the speed Woodliff used at the time he was fired, are the things which seemingly convinced the Examiner that the matter of the rheostat setting above mentioned was merely a subterfuge used

by the Company to disguise its true reasons for the discharge of Woodliff.

■ It has long been established that for the purpose of determining whether or not a discharge is discriminatory in an action such as this, it is necessary that the true, underlying reason for the discharge be established. That is, the fact that a lawful cause for discharge is available is no defense where the employee is *actually* discharged because of his Union activities. *A fortiori*, if the discharge is *actually* motivated by a lawful reason, the fact that the employee is engaged in Union activities at the time will not tie the employer's hands and prevent him from the exercise of his business judgment to discharge an employee for cause. Fort Smith Broadcasting Co. v. N. L. R. B., 341 F.2d 874 (8 Cir. 3/4/65); Onan v. N. L. R. B., 139 F.2d 728 (8 Cir. 1944); N. L. R. B. v. Montgomery Ward & Co., 157 F.2d 486 (8 Cir. 1946); N. L. R. B. v. Citizen-News Co., 134 F.2d 970 (9 Cir. 1943); N. L. R. B. v. Huber & Huber Motor Exp., 223 F.2d 748 (5 Cir. 1955); N. L. R. B. v. Dixie Terminal Co., 210 F.2d 538, 43 A.L.R.2d 902 (6 Cir. 1954); N. L. R. B. v. Mylan-Sparta Co., 166 F.2d 485 (6 Cir. 1948); Bon-R Reproductions, Inc. v. N. L. R. B., 309 F.2d 898 (2 Cir. 1962); N. L. R. B. v. Jamestown Sterling Corp., 211 F.2d 725 (2 Cir. 1954). It must be remembered that it is not the purpose of the Act to give the Board any control whatsoever over an employer's policies, including his policies concerning tenure of employment, and that an employer may hire and fire at will for any reason whatsoever, or for no reason, so long as the motivation is not violative of the Act. N. L. R. B. v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937); Associated Press v. N. L. R. B., 301 U.S. 103, 57 S.Ct. 650, 81 L. Ed. 953 (1937); American Smelting & R. Co. v. N. L. R. B., 126 F.2d 680 (8 Cir. 1942); N. L. R. B. v. Rickel Bros., 290 F.2d 611 (3 Cir. 1961).

■ Accepting the Trial Examiner's conclusion that some disciplinary action was justified here, and remembering the limited scope of this review, we cannot find there is any substantial evidence in this record considered as a whole to support the conclusion that Woodliff was discharged *solely* because of his adherence to the Union, *despite* his objectionable behavior. N. L. R. B. v. Miami Coca-Cola Bottling Co., 222 F.2d 341 (5 Cir. 1955). In this connection, we, of course, disregard the Examiner's findings as to the severity of the action in relation to Woodliff's behavior, and say, once it is determined that disciplinary action is warranted the extent of the action taken is purely within the discretion of the employer, and the Board may not substitute its judgment for that of the employer. Fort Smith Broadcasting Co. v. N. L. R. B., supra; N. L. R. B. v. Milwaukee Elec. Tool Corp., 237 F.2d 75 (7 Cir. 1956); N. L. R. B. v. Coats & Clark, Inc., 231 F.2d 567 (5 Cir. 1956); N. L. R. B. v. Mylan-Sparta Co., supra.

Here, it clearly appears when Woodliff disagreed with his foreman, Wagner, he simply refused to obey and, as found by the Examiner, gave the employer cause to discipline him. The Examiner concluded, however, that the real motivation for the discharge was anti-Union bias. Such conclusion of the Examiner can only be convincing if the evidence of cause for Woodliff's discharge is wholly discredited. The only evidence, as opposed to suspicion, in the record supporting the Examiner's conclusion is a remark by a foreman on another shift, that he "figured" Woodliff was fired because of the Union; and that he "figured" the reason Woodliff was discharged was that he "listened to Newell Fletcher," one of the Union organizers. Subsequent remarks made by Wagner and Maxwell to the effect that Woodliff would have made a good employee if he had not got "mixed up" with the "wrong people," add little to the substantiality of the evidence as cause for discharge, as there is no showing that "wrong people" has anything to do with Union people.

The Examiner's reliance on the various speeds at which other employees oper-

ated the warm-up machine as showing a subterfuge on the part of the Company is misplaced, as the Company does not contend that Woodliff was discharged because he ran the machine at some specific speed, but rather, that he was discharged for "misconduct"—his insubordination in refusing to change the speed of the warm-up mill as instructed, and in lowering the rheostat to a slower speed after Supervisor Wagner had set it at a higher rate of speed. Such was a matter wholly within the "realm of managerial prerogatives." Cf. National Labor Relations Board v. Burnup & Sims, Inc., 379 U.S. 21–24, 85 S.Ct. 171, 13 L.Ed.2d 1.

In opposition to the Examiner's conclusion that Woodliff was discharged for Union activity is the definite denial of knowledge on the part of management officials as to Woodliff's Union membership, and the testimony of the Union organizer to the effect that at the time of Woodliff's discharge the campaign was *undercover and conducted in secret*. It is noted that the discharge of Woodliff and the statement by Foreman Young took place prior to the first election and prior to the sequence of events leading up to the finding of unfair labor practices as ultimately found by the Board. This Court has held that coincidence in time between Union activity and discharge does not in itself raise an inference of knowledge on the employer's part of the Union members without some direct evidence of knowledge. N. L. R. B. v. Falls City Creamery Co., 207 F.2d 820 (8 Cir. 1953).

■ The Examiner made much of the fact that one of the employees who knew of Woodliff's Union activities later turned out to be pro-management in the labor dispute. Such a circumstance, absent some evidence that the employee communicated his knowledge about his fellow employee to the Company, is insufficient to raise an inference of knowledge on the part of the Company. Cf. N. L. R. B. v. Ray Smith Transport Co., 193 F.2d 142 (5 Cir. 1951).

■■ While there is authority to the effect that in a small plant in a small town, knowledge on the employer's part of the organizational activities of the employee can be inferred, as pointed out in the Falls City case, supra, this inference cannot stand without some direct evidence to support it, and this idea is not restricted to the Falls City case alone. Indiana Metal Products Corp. v. N. L. R. B., 202 F.2d 613 (7 Cir. 1953). It is, of course, impossible for a discharge to be discriminatory without knowledge on the part of the employer of the employee's Union activities.

■ In other words, here the evidence abounds that there was a justifiable cause for Woodliff's discharge. Assigning an illegal cause therefor is only possible by drawing an inference from certain vague statements on the part of management officials, while ignoring positive evidence arrayed against such inferences. "Circumstances that merely raise a suspicion that an employer may be activated by unlawful motives are not sufficiently substantial to support a finding." N. L. R. B. v. Citizen-News Co., 134 F.2d 970, 974 (9 Cir. 1943). This being so, we cannot conscientiously hold that the record as a whole contains substantial evidence that the discharge of Woodliff was motivated by other than lawful business reasons. Cf. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

The Board's order will be modified by striking therefrom all references to the reinstatement of Woodliff with back pay, and, so modified, will be enforced.