NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

MELROSE PROCESSING CO.,
Respondent.

No. 17979.

United States Court of Appeals
Eighth Circuit.

Oct. 29, 1965.

694

William Wachter, Atty., N. L. R. B., Washington, D. C., Arnold Ordman, General Counsel, N. L. R. B., Dominick L. Manoli, Associate Gen. Counsel, N. L. R. B., Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B., and Gary Green, Atty., N. L. R. B., Washington, D. C., for petitioner.

Robert G. Johnson, of Johnson, Schmidt & Thompson, Willmar, Minn., for respondent.

Before MATTHES and GIBSON, Circuit Judges, and REGAN, District Judge.

GIBSON, Circuit Judge.

This case is before the Court on the petition of the National Labor Relations Board (Board) pursuant to Title 29 U.S.C. § 160, seeking enforcement of two orders issued against respondent, Melrose Processing Company. These orders were issued on April 21, 1964 and March 31, 1965 and are reported at 146 NLRB No. 118, and 151 NLRB No. 134 respectively. The main issue is an alleged discriminatory refusal to rehire a former employee.

Melrose Processing Company (Melrose) operates a plant employing approximately 200 persons in the small town of Melrose, Minnesota, population 2,000. Melrose is engaged in the business of slaughtering, processing and distributing turkeys which are shipped in interstate commerce. The plant is operated on a seasonal basis in which it completely closes for relatively long periods of time and the workers are hired anew at the beginning of each season. It has been the custom for Melrose to advertise when it planned to begin its seasonal operation and invite applications for employment. All past and prospective employees had to submit applications. It was the practice, however, to give all previous employees priority and rehire them if their past work had been satisfactory.

In the spring of 1963, Melrose reopened its plant but refused to re-employ one, Celesta Thielen, who had worked for Melrose during the past two seasons. It was this refusal that gave rise to the action initiated by the Board.

Celesta Thielen went to work for Melrose in September 1961 and worked until the season ended in June 1962. The plant reopened in August 1962 and Miss Thielen was rehired for that season. The plant ended this season in December 1962 and remained closed until June 1963. In the spring of 1963 Melrose, as usual, advertised its contemplated opening. Miss Thielen submitted her application, but when the plant opened in June she was not accepted for employment.

While employed by Melrose, Miss Thielen worked as a neck slitter in the eviscerating room. From the testimony of her superiors there can be little doubt but that she was a capable employee, that she "was really good * * * handling the knife." The facts are clear, however, and Miss Thielen herself admitted that she engaged in some "horseplay" while on duty by singing and throwing turkey parts at fellow employees. Although there is some conflict, it appears that Miss Thielen's supervisors were not generally aware of this "horseplay" at the time her application for re-employment was rejected. More important, however, this "horseplay" never entered the discussion of whether or not she should be rehired for the 1963 season.

The record clearly reflects that fellow employees from other departments had a tendency to gather in the corridor near Miss Thielen's work station. Her employers were fully aware of this situation and apparently had issued several warnings to the persons who gathered in this area but did not reprimand Miss Thielen. Moreover, there is nothing in the record to indicate that Miss Thielen encouraged or was responsible in any way for this congregation.

Melrose, the record indicates, under direction of its insurance carrier, had initiated a vigorous safety program. It should be noted, however, that Miss Thielen's safety record had been very good. During her two seasons with Melrose she had received only one minor cut on her hand. It appears that other employees involved in more serious accidents were rehired.

There is disagreement as to whether or not Miss Thielen was the only former Melrose employee who was not rehired for the 1963 season. Neither party saw fit to clarify the issue by intro-

ducing the company employment records. The trial examiner found that she was the only person not rehired for the 1963 season. Although the evidence on this point is, at best, incomplete, we cannot hold that this conclusion was erroneous. It was the Board's contention that Miss Thielen was the only person not rehired for the season, and they elicited some evidence from a Melrose supervisor that this position was correct. Melrose, on the other hand, had easy access to the company records that could have refuted this contention and cleared any ambiguity. They chose, however, not to introduce these records. The Court recognizes that it is incumbent upon the Board to carry the burden of proof to show discrimination. However, when, as here, an ambiguous situation is presented which may be resolved by evidence in possession of the opposing party, the burden of going forward with the evidence on this issue shifts to that party. Failure of Melrose to uphold this burden of going forward with the evidence gives credence to the trial examiner's finding.

Although not always, it appears that it was the general practice for Melrose to warn employees who were guilty of rule infractions before they were discharged. On some occasions miscreant employees were placed on probation. At any rate, it was the general policy of Melrose to try to "straighten out" employees rather than discharge them. Apparently, numerous employees who were guilty of rule infractions were retained and rehired at the beginning of the season.

A few days after the plant reopened in June 1963, Miss Thielen visited the plant office in an attempt to ascertain the reason for not being rehired. The Plant Superintendent talked to Miss Thielen but refused to offer any explanation.

At the hearing before the trial examiner the record discloses that Plant Manager White, who was primarily responsible for the decision not to rehire Thielen admitted that he had stated "her attitude wasn't with our ideas." He, as well as other company representatives, testified that the reason Miss Thielen's applica-

tion was turned down was because the commotions caused by the gatherings near her work station created a safety hazard. They admitted, though, that she had never been warned or reprimanded.

From this evidence the trial examiner concluded that Miss Thielen was not rehired not because of her "horseplay" or because of the congregation of the off-duty workers.

While working for Melrose, Miss Thielen became very active in union activities. In November prior to the plant closing in December 1962, Miss Thielen was contacted by a union organizer, and she agreed to form an employee committee. During her lunch hours and before and after work Miss Thielen spoke to her fellow employees about the union and succeeded in forming such a committee. The record indicates that she attended at least five different organized meetings and personally arranged meeting facilities for three of them. At one of these meetings Miss Thielen was elected chairman of the local organization committee.

On one occasion Miss Thielen was in the presence of a number of union representatives when her foreman and another Melrose supervisor drove by the group in an automobile. On another occasion Miss Thielen was present at an "open forum type" meeting in which Melrose's representatives presented its case against unionization. While at this meeting and while standing only a few feet from Plant Manager White and the Company President [Mr. Olson], Miss Thielen was introduced to the director of the union,

Finally there is testimony from Plant Manager White wherein he admitted that he had knowledge that Miss Thielen was connected with the union.

The trial examiner concluded that Melrose was well aware that Miss Thielen was a leader of the union's organization drive. The trial examiner found that Melrose's activities affected commerce as defined in § 2(6) and (7) of the National Labor Relations Act, 29 U.S.C. § 152(6)

and (7), (which finding is not challenged in this proceeding). Finally, when coupled with the evidence heretofore related, the trial examiner concluded that Miss Thielen was not rehired in the spring of 1963 because of her union activities during the winter months of 1962–63, and that this was an unfair labor practice within the meaning of § 8(a) (1) and (3) of the National Labor Relations Act, 29 U.S.C. § 158(a) (1) and (3).

The trial examiner's recommended order contained a broad provision requiring Melrose to cease and desist from discriminating against any employee or applicant because of their union activity. The proposed order also required a reinstatement of Miss Thielen without prejudice to her position and a payment to make her whole for the loss of earnings caused by the unlawful discrimination.

The findings of the trial examiner were affirmed by the Board and the above proposed order was adopted April 21, 1964.

Thereafter, a "back pay hearing" was conducted pursuant to 29 C.F.R. 102.52. The Board then issued a second and supplemental order dated April 13, 1965, requiring Melrose to pay $1,961.11 as back pay. This sum was arrived at by deducting from gross pay for the period of June 17, 1963 to May 30, 1964 interim earnings of $300 and that portion of back pay that accrued during a period of disability. The Board refused to deduct interim income earned at a local tavern due to the fact that Miss Thielen had worked there part time even while working for Melrose, and that her earnings there had not increased during this period of discrimination. In addition the Board refused to deduct as wages the value of the room and board furnished by her parents. Finally, the Board refused to deduct an amount paid for compensation for partial loss of two fingers which occurred in an accident while working for her father. Melrose objects to each of these refusals.

## DISCRIMINATION ISSUE

If Miss Thielen was not rehired because of her union activities, Melrose is guilty of discrimination proscribed by the National Labor Relations Act.

"It shall be an unfair labor practice for an employer * * * by discrimination in regard to hire or of tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a) (3).

The Act empowers the National Labor Relations Board to make this factual determination of discrimination. If this factual conclusion of the Board is based upon substantial evidence on the whole record, this Court must accept them as binding. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); N. L. R. B. v. Decker, 322 F.2d 238 (8 Cir. 1963).

The essential ingredients in this case are a knowledge on the part of the employer that the employee is engaged in union activity and a failure to rehire the employee because of this activity.

After a hearing the Board concluded that Melrose was aware of Miss Thielen's union activity and that because of this activity she was not rehired for the 1963 season. In order for us to determine if there is a substantial evidentiary foundation on which to base this conclusion we should examine each of its two elements separately.

First, was there substantial evidence to support the finding that Melrose was aware of Miss Thielen's union activities? We think there was. There is no doubt from the record that Miss Thielen was the recognized and elected leader of the union campaign. She had openly discussed the union at the plant with fellow workers. She had arranged, organized, and attended several meetings in the area. All of this taking place in a small community, involving the town's major employer, can give rise to the inference

that the employer had knowledge of her activity. A. P. Green Fire Brick Co. v. N. L. R. B., 326 F.2d 910 (8 Cir. 1964); N. L. R. B. v. Entwistle Manufacturing Co., 120 F.2d 532 (4 Cir. 1941).

■ Furthermore, on at least two occasions, Miss Thielen was in the presence of known union officials at a time when her employers were in the near vicinity. The appearance of an employee and union officials in a public place can be used as a basis on which to infer knowledge of an employee's union activity. N. L. R. B. v. Entwistle Manufacturing Co., supra.

Finally, there is some direct evidence from the mouth of the plant manager admitting that he was aware that Miss Thielen was in some way connected with the union.

These two permissible inferences along with this direct evidence are clearly sufficient evidence upon which to base a finding that Melrose was aware of Miss Thielen's union activities. In the face of this evidence the Board is not required to accept the protestations of innocence on the part of the employer.

Now to consider the second element, was there substantial evidence to support the conclusion that Miss Thielen was not rehired because of her union activities. Again we feel there was.

\* [6] It would indeed be the unusual case in which the link between the discharge and the union activity could be supplied exclusively by direct evidence. Intent is subjective and in many cases the discrimination can be proven only by the use of circumstantial evidence. Furthermore, in analyzing the evidence, circumstantial or direct, the Board is free to draw any reasonable inferences. As we stated in Kitty Clover, Inc. v. N. L. R. B., 208 F.2d 212, 214 (8 Cir. 1953):

"The Board \* \* \* is the judge of the facts, the credibility of the witnesses, and the weight of the evidence, and may draw inferences from circumstantial, as well as direct, evidence. It is only when the Board's determination is without adequate support in the evidence

\* \* \* that this Court may set aside an order or refuse its enforcement."

Therefore, let us examine the circumstantial evidence and the inferences drawn therefrom in order to determine if the Board's conclusion has adequate support.

■ It is well known that a given fact may be proven indirectly as well as directly. If one can show that every other alternative except the fact sought to be proved is not true, you indirectly prove that fact is true. By excluding every other reasonable hypothesis that fact is left standing alone as proved. The evidence before the Board aimed at this goal. By showing that there was no other reasonable explanation for Miss Thielen not being rehired, her union activity stood out as the logical explanation of her employer's action. While this method is not infallible, it succeeds in providing circumstantial evidence to illuminate the issue.

■ As a starting point we accept the premise that something, which is unknown at this point, motivated Melrose to reject Miss Thielen's application. We can eliminate at once incompetence, absenteeism, poor safety record, and personal antagonism as motivating factors. We can also eliminate "horseplay" because the record clearly indicates that this issue took no part in the consideration not to rehire Miss Thielen. Next come the unauthorized gatherings, which Melrose advanced as its motivation. This reason was not accepted by the Board, and we believe that the record supports the Board's position on this point. The Board is not required to accept the employer's ground for discharging an employee when the record indicates otherwise. N. L. R. B. v. Texas Bolt Co., 313 F.2d 761 (5 Cir. 1963).

■ Therefore, accepting the premise that something must have motivated Melrose to vary from its normal employment routine, all of the common reasons for this variance have been accounted for and eliminated by the evidence.

Couple this with the evidence that Miss Thielen was the known leader of the organizing movement, the resulting inference is that Miss Thielen was not rehired because of her union activities. The fact that an employee is a member of a union does not lead to the inference that he was fired because of this union activity. However, when every other plausible motive has been eliminated and the reasons advanced are not persuasive, the union activity may well disclose the real motive behind the employer's action. Burk Brothers v. N. L. R. B., 117 F.2d 686 (3 Cir. 1941). As we said in N. L. R. B. v. Des Moines Foods, Inc., 296 F. 2d 285, 289 (8 Cir. 1961):

> "It would seem safe to say that an employer who, during an organizational campaign or before the heat of such a campaign has been dissipated, discharges a competent employee, with a record of long service, who has been a strong supporter of the union, renders himself vulnerable to a charge of having done so because of the employee's union activities."

■ This inference, however, is not the sole evidence of discrimination. The record discloses that Miss Thielen sought an explanation for not being rehired. She was supplied none. When presented with this same situation the Fifth Circuit had this to say, "This refusal to tell Booth [the employee] * * * was a circumstance which might 'alone * * be enough to support an inference that the discharge was discriminatory' " (citations omitted) N. L. R. B. v. Plant City Steel Corp., 331 F.2d 511, 515 (5 Cir. 1964). Likewise, in circumstances as here presented we hold that an employer's refusal to supply a reason for the discharge when confronted by the employee is evidence in support of a conclusion that the employer practiced anti-union discrimination.

■ In the record we find additional evidentiary support for the Board's conclusion. It was admitted company policy to issue warnings to an employee thought to be guilty of rule infractions. It was believed better to "straighten out" the employee rather than discharge him. Even though it was alleged that Miss Thielen was the cause of the hallway congregations, she was never reprimanded nor issued a warning. This failure to warn Miss Thielen prior to her not being accepted for re-employment indicates that she was not rehired for a rule infraction as the company indicated. From this failure to issue a warning it can be inferred that the reason propounded by Melrose was not the activating factor and further that Melrose's activity was motivated by a desire to discourage the union. A. P. Green Fire Brick Corp. v. N. L. R. B., supra; N. L. R. B. v. Plant City Steel Corp, supra.

The record indicates that employees guilty of far more serious offenses had not suffered the same · fate as Miss Thielen. It appears therefrom that Miss Thielen was singled out for special treatment. This too, tends to indicate discrimination by the employer. A. P. Green Fire Brick Corp. v. N. L. R. B., supra.

Finally, there is some direct evidence on the issue. The record contains the curious statement attributed to the Plant Manager that "her attitude wasn't with our ideas." This statement on its face could easily be construed as evidencing certain anti-union motivation. Even though an explanation was advanced, the Board, whose prime duty is to evaluate and determine the veracity of the testimony, may discount the explanation and hold the true meaning of the statement indicated that Melrose was unhappy with Miss Thielen's union activities. This is what the Board has done, and we do not believe there was any error in so doing.

Therefore, in review, we feel that the following facts clearly support a finding of discrimination:

1. Miss Thielen was a competent employee;

2. She was a known leader of the unionization drive;

3. There was no acceptable reason advanced for her not being rehired;

4. She was issued no warning;

5. Other employees guilty of serious rule infractions were rehired;

6. No explanation was given to Miss Thielen;

7. All of this was during a unionization drive; and

8. The statement that "her attitude wasn't with our ideas."

While each of these points is but a single block and alone might not be enough to support the finding of the Board, when they are placed side by side these blocks form a sufficient foundation to support the finding of discrimination.

This Court in the A. P. Green case, supra, upheld a Board ruling of discriminatory firing on evidence not nearly as strong as presented here. Therefore, on this issue we feel that the evidence supports the finding of the Board and the Board's decision should be affirmed.

## SCOPE OF THE ORDER

 The order of the Board dated April 21, 1964 not only required that Celesta Thielen be reinstated and made whole, but it ordered Melrose to:

"1. Cease and desist from discriminating against any employee or any applicant for employment because of activity on behalf of United Packinghouse, Food & Allied Workers Union of America, AFL–CIO, and from in any other manner interfering with, restraining, or coercing employees in the exercise of their rights guaranteed in Section 7 of the Act."

It is the opinion of this Court that this broad order is not justified by the record. The record admittedly contains only one discriminatory act, and one discriminatory act, in itself, does not justify an enjoinment of all possible future discriminatory activity. As we said in Brewers and Maltsters Local Union No.

6 v. N. L. R. B., 301 F.2d 216, 227 (8 Cir. 1962):

"The Board, under the Act, has broad powers in determining the necessary scope of its orders, but on the other hand not the authority to enjoin violations of all provisions of the Act, merely because it finds one provision to have been violated."

In order to justify a broad cease and desist order the record must demonstrate that the anticipated violations have some relationship to the employer's past activities. There is no such justification in this case. In such case we feel bound by our prior decision of N. L. R. B. v. Standard Metal Fabricating Co., 297 F.2d 365, 367 (8 Cir. 1961) in which we held:

"(T)he discharge of Thomas (employee), standing alone, did not furnish a sufficient basis for the general proscription contained in * * * (the order) nor a sound reason for anticipating that respondent's employees were in danger of losing their freedom to exercise the rights guaranteed them under Section 7 of the Act * * *"

## BACK PAY

 The supplemental back pay order dated March 31, 1965, concluded that Miss Thielen was entitled to $2,383.62 gross back pay. From this sum was subtracted interim earnings of $300 which were received from employment in her father's locker plant. Also deducted was a sum of $122.51 representing that portion of gross back pay accruing during a period of disability. Melrose contends that there should have been additional deductions of (1) room and board, (2) earnings at Mullner Tavern, and (3) a workmen's compensation award.

Melrose points out that Miss Thielen was living with her parents while working for her father. They argue that the room and board supplied her was compensation that should be deducted from gross back pay. The Board did not agree, and we believe the Board was justified in so ruling. It appears that

the room and board was not dependent upon Miss Thielen working for her father, but would be supplied gratuitously under any circumstance. This is not compensation. Furthermore, since the room and board was supplied when Miss Thielen was working at the Melrose plant, even if considered compensation, it was clearly collateral and not subject to deduction.

Melrose points out further that Miss Thielen worked at Mullner Tavern during the period of discrimination and that her earnings there must be subtracted. The record is clear that Miss Thielen worked at the tavern part time during the discrimination. However, it appears that Miss Thielen had been working at this tavern even while employed at the Melrose plant. Though the number of hours she worked there increased after she was not rehired by Melrose, it appears that her salary did not increase to any extent. Therefore, the Board was not required to include this income as interim earnings.

Finally, it appears that Miss Thielen injured two of her fingers while working at her father's locker plant. She was awarded a sum under the provisions of the Minnesota Workmen's Compensation Act. Relying on the case of N. L. R. B. v. Moss Planing Mill Co., 224 F.2d 702 (4 Cir. 1955), Melrose contends that this award of workmen's compensation must be deducted. It is true that this case held that an employer was entitled to a deduction of the amount of workmen's compensation paid to an employee. Under the circumstances, however, we do not feel that we should be bound by this holding.

The workmen's compensation award to Miss Thielen represented two things; one, repayment for earnings lost during the disability, and two, reparation for the partial loss of two fingers. The amount representing lost earnings had already been deducted from the gross back pay figure and is not reflected in the net award. Therefore, to allow a second deduction representing compensation attributable to lost income for the same period of time would result in an unfair double deduction.

■ The balance of the award represented reparation for the partial loss of two fingers. We feel likewise, that this amount should not be deducted. In a back pay determination, the Board has broad discretion to determine the proper amount of the award. The Board's goal should be to make the employee "whole." We do not believe the amount of the workmen's compensation attributable to a reparation for the injured fingers should be equated with wages and allowed as a deduction. This compensation was made pursuant to the broad social policy of the state to relieve disabled workers from the results of their injuries. The award did not represent wages or a substitute therefor, but was an attempt to compensate for the loss of a member of the body. This is not a recovery for which the employer is entitled to take advantage.

The Supreme Court in the case of N. L. R. B. v. Gullett Gin Co., 340 U.S. 361, 71 S.Ct. 337, 95 L.Ed. 337 (1951), held that unemployment compensation awards were not required to be deducted from back pay. We also held in N. L. R. B. v. Brashear Freight Lines, Inc., 127 F.2d 198 (8 Cir. 1942), that food received from the employee's union did not require deduction from back pay. If these cases did not result in a double recovery we fail to see how the award in the present case does. We hold the calculation was proper.

In conclusion, it is the opinion of the Court that there is substantial evidence supporting Section 2 of the Board's order dealing with reinstatement of an employee who was a victim of discrimination. However, there was no proper basis for the broad cease and desist provision found in Section 1. Therefore, with the exception of Section 1, the order dated April 21, 1964, shall be enforced. We are also of the opinion that there was no error in the supplemental back pay order of March 31, 1965, and its enforcement is likewise awarded.