**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

**v.**

**GARNER TOOL AND DIE MANUFACTURING, INC., Respondent.**

**No. 73–1292.**

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 13, 1973.

Decided March 11, 1974.

John H. Ferguson, Atty., Lit. Services, National Labor Relations Board, Washington, D. C., for petitioner.

William H. Bruckner, Lincoln, Neb., for respondent.

Before MEHAFFY, Chief Judge, MOORE *, Senior Circuit Judge, and WEBSTER, Circuit Judge.

WEBSTER, Circuit Judge.

The National Labor Relations Board seeks enforcement of its order directing that Garner Tool and Die Manufacturing, Inc. offer reinstatement to its former employee, Paul Hill, make him whole for any losses he incurred by reason of the discharge, cease and desist from unfair labor practices, and post appropriate notices. The Board's order was based on the findings of the administrative law judge that the company unlawfully discharged employee Hill because of his suspected union activities, in violation of §§ 8(a)(1) and 8(a)(3) of the National Labor Relations Act. We have carefully reviewed the record as a whole and conclude that substantial evidence does not exist in this record to support the Board's order; we therefore deny enforcement.

Because the Board's position depends upon our accepting as true the inferences drawn from circumstantial evidence by the administrative law judge, a somewhat more detailed statement of the facts is required. Garner Tool and Die Company ("Company") manufactures tools, dies, jigs, fixtures, molds and other items at its Lincoln, Nebraska plant. In addition to its office staff, made up of Edward Garner, president of the company, Phil Mullin, Garner's son-in-law, and Garner's wife, the company employs approximately 15 persons—11 in its tool room and 4 in its production room.

Paul Hill had been employed in the company's tool room for approximately six years. When the employees established a shop committee in 1970, Hill was elected chairman or spokesman of the group and met with President Garner at irregular intervals to discuss employee grievances and other problems. On October 13, 1971, Garner announced

* LEONARD P. MOORE, Senior Circuit Judge, Second Circuit, sitting by designation.

that the company would no longer order tools for employees costing less than $10.00. Hill objected to this policy change because certain tools (such as Allen wrenches) were constantly wearing out. Garner replied that he would buy a set of Allen wrenches for anyone who could not afford them. Hill was not satisfied with this response, asserting that the company should furnish these small tools without charge to the employees.

The employees were working a ten-hour day, from 6:00 a.m. to 4:30 p.m., when Garner announced on October 27 that the work day was being reduced to nine hours. Garner did not specify a starting-quitting time, but did indicate his preference for a 7:00 a.m.–4:30 p.m. work day because it would not look good to customers to see the shop empty so early in the afternoon. At a coffee break on the day of the announcement, some of the employees met and decided to continue starting at 6:00 a.m. Hill did not attend this meeting.

On October 28 and 29, most of the tool room employees reported at 6:00 a.m. and left at 3:30 p.m. Hill and a few others reported at 7:00 and worked until 4:30. At 3:45 p.m. on Friday, October 29, Mullin approached Hill in the tool room and said that Garner was infuriated because most of the employees had left an hour early. Hill said, "They came in at 6:00. They had worked the nine hours like he requested and they left." Mullin then commented, in effect, that Garner did not want the employees coming in at 6:00 a.m., that they didn't realize how good the company was to them, and they were always bickering about little things like the company policy on buying tools.

Then the following occurred according to Hill's testimony:

When he brought up this deal about the Allen wrenches I said, 'when you take a man that will invest $3,000.00 in tools to make another man money,'

and I said, 'then some son-of-a-bitch wouldn't buy them an Allen wrench,' I said, 'well, this is pretty chicken-shit.'

That ended the conversation and Mullin returned to the office.

About fifteen minutes later, Garner approached Hill and asked him what time he had come to work that day. Hill said 7:00 a.m. Garner asked what time he was coming to work on Monday, and Hill asked Garner what time he wanted him to come. Garner then asked Hill about the other employees, and Hill stated that he did not know when they were coming to work, but that it probably depended on when their group leader told them to report. Garner then returned to the office.

Again, at 4:35 p.m., according to Hill's testimony:

Mr. Garner came out of the office and come over to the bench to my tool box, and put his arm on my back and patted me on the back and said that everything was o.k., that it is good to blow off steam, it was healthy to blow off steam, and everything was all right.

Some time that weekend, President Garner posted a notice informing the employees that effective Monday morning they were not to begin work before 7:00 a.m. Garner arrived at the shop at 6:50 a.m. on Monday, November 1, and discovered that the employees present had been working for some time. Each employee was asked if he had seen the notice, and when they replied yes, he suspended them for the remainder of the day. Hill arrived at 6:55 a.m. as the other men were leaving, and Garner summoned him to the office. Garner informed Hill that he was being laid off for one week. Hill asked why and Garner stated, "You referred to me as a son-of-a-bitch." Hill then said, "Ed, you told me yourself that you were a son-of-a-bitch to work for." Garner replied "Yes, I don't want to talk about it anymore, I don't want to see your face around here until

next Monday. You can come back then and work." [1]

That evening, the tool room employees met, decided to join the union, and all signed authorization cards. A union representative communicated that fact to Garner the following day and a meeting was set up for Friday, November 5. By letter dated November 4, 1971, Garner informed union representative Dean Kocina that the Friday meeting was cancelled and that all further communications regarding the union's request for recognition should be addressed to the Midwest Employers Council, which Garner had engaged to represent the company in the matter.

On Friday, November 5, Garner contacted Hill and the following occurred, according to Hill's testimony:

Mr. Garner, over the phone he says, 'Paul,' he says, 'we are going to let you go.' And I says, 'for what reason?' And he says, 'any body that thinks of me in that manner,' he says, 'we don't have any place for them in the shop.'

So I said, 'well, am I laid off or fired, or what?' He said, 'Yes,' he just left it hanging. He said, 'Yes,' you could tell by his voice that he was upset or something. He said I could pick up my tools that night if I wanted to and I told him that I was leaving for a trip out of town and I would not be able to pick them up until early the following Monday morning.

When Hill picked up his tools on Monday morning, some of the other employees, upon learning what had happened, walked off the job. Beginning Wednesday, October 10, Garner conducted personal interviews with each of the employees in the tool room and ordered them to return to work the following day or never return. In discussing Hill's discharge, Garner told employee Olson that Hill had been fired not only because of the events of the previous week but because Hill had stolen from the company in the past. [2]

Garner told employee Hester that Hill had stolen company property in the past, but that he had paid for it and made amends; that Hill had been complaining about the company policy on tools; and that Hill was outspoken and was a rabble-rouser. Garner asked employee Knop what he would do if Hill called him an S.O.B. and Knop replied "Well, he has probably called me that before." Garner then asked Knop what he would do if Hill called his dad that, and Knop replied that would probably be a different story. Garner explained to Knop that Hill had called him an S.O.B. and had "slammed" his office personnel on October 29; that when Garner hired Hill he had contacted his previous employer and they had told him that Hill probably couldn't be handled but Garner decided to try anyway; and that Garner had been very upset about what Hill had said and hadn't slept well because of it.

Employee Morack testified that Garner told him that the employees had acted before hearing both sides of the story. He told Morack that Hill had stolen from him in the past, that Hill's prior employer had informed him that Hill was a trouble maker and an agitator, which he was, but that he had decided to give Hill a chance. Garner told Morack "that he dismissed Paul [Hill] for a week and said that he told him that he

1. Only Hill testified with respect to his conversations with Garner. The company presented no evidence and neither Garner nor Mullin testified. The company rested on its position that General Counsel had failed to establish a prima facie case.

2. Sometime in 1968 or 1969 Hill had taken some materials and tools from the shop without paying for them. Believing Garner knew about this, he went to Garner, told him he had taken the material, and said he wanted to pay for it and make amends. Garner permitted him to pay for the material by making deductions from his check and Garner said it would never be mentioned again and that Hill had been forgiven. In a shop meeting two days after the occurrence, Garner explained the situation to the entire staff and told them that it should never be mentioned again, that it was completely forgotten.

could just keep right on going if he wanted to because he didn't know if he could work for him or not any more . . . ."[3]

The International Association of Machinists, Lodge 31, filed charges and this complaint thereafter issued by the Board alleging that Hill's discharge was unlawful. There was no evidence in the record and no finding by the examiner or the Board of any anti-union animus by the employer. The examiner found no direct evidence that the company had actual knowledge of Hill's union activities or that Hill was in fact a leader in the union organization effort.

 The trial examiner held:

Upon all of the facts, including particularly the fact that Garner gave Hill false explanations both for his suspension on November 1 and his discharge on November 5, I conclude that Garner's motive in both suspending and discharging Hill was one which he desired to conceal—an unlawful motive—namely, a desire to rid himself of this outspoken advocate of the rights of the employees whom he suspected had led the employees not only in their concerted refusal to report for work at 7 a.m. but also with respect to their seeking union representation. Accordingly,

Hill's suspension on November 1 and his discharge on November 5 were illegally motivated. However, in view of the fact that the complaint did not put in issue the legality of Hill's suspension on November 1, I make no findings in this regard and conclude only that Hill's discharge on November 5 violated Section 8(a)(3) and (1) of the Act.[4]

We hold that the record will not support a finding of knowledge that Hill was engaged in union activities, nor will it support a finding that Hill was discharged because Garner suspected such activities. Garner's own explanations for discharging Hill, as related by all of the witnesses including Hill, were consistently based upon the S.O.B. comment and other past occasions for dissatisfaction brought to a head by the latest comment.[5] No anti-union animus was demonstrated.[6] The Board makes too much of Garner's statement to Hill on Friday afternoon that it was good to blow off steam. It first infers that Garner knew of the S.O.B. incident at the time this statement was made and then infers upon this inference condonation of the S.O.B. remark, and from this concludes that some other reason must have motivated the discharge. While the Board is free to draw reasonable inferences from the evidence, direct and

---

3. The company asserts that this testimony was a direct contradiction of Hill's testimony that he had been suspended on November 1 and discharged on November 5, and demonstrates that Hill was actually discharged on Monday, November 1. The examiner stated that he did not perceive the "direct contradiction" in the two statements, but in any event, could not accept Morack's statement since Garner, who failed to testify, made these statements in an attempt to justify his discharge of Hill. To the extent there was a dispute, the examiner deemed Hill's sworn testimony more credible than Morack's double hearsay.

4. The company here asserts that it was denied due process because the complaint failed to allege illegality in the suspension, claiming the trial examiner's disclaimer quoted above fails to negate the fact that finding the suspension illegal was essential to the examiner's conclusion that the discharge was illegal. Since we find insufficient evidence in this record to support the Board's conclusion, we need not reach the due process question.

5. *Cf.* NLRB v. Wal-Mart Stores, Inc., 488 F.2d 114 (8th Cir. 1973).

6. Garner had initially agreed to meet with the union representative on Friday, November 5. However, he changed his mind two days later in a letter characterized by the examiner as "quite unfriendly", and decided to deal with the union through a management association. While these facts support an inference that Garner decided to change his tactical approach toward the union, this inference alone or in combination with the undisputed facts does not support the inference that Garner decided to discharge Hill as an anti-union tactic.

circumstantial, NLRB v. Melrose Processing Co., 351 F.2d 693, 699 (8th Cir. 1965), it may not build inferences upon inferences to reach a finding which is no more than educated conjecture. Assuming that Garner in fact knew that Hill had referred to him as an S.O.B., and assuming further that Garner's conciliatory statement to Hill about letting off steam in fact referred to the S.O.B. comment, we cannot follow the Board's final attenuation that this foreclosed any subsequent determination that Hill should be discharged.

The Supreme Court defined substantial evidence in NLRB v. Columbian Enameling & Stamping Co., 306 U.S. 292, 300, 59 S.Ct. 501, 505, 83 L.Ed. 660 (1939):

> Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. 'It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion . . . .'

Thus the Board's findings may not rest on "suspicion, surmise, implications, or plainly incredible evidence." Amyx Industries, Inc. v. NLRB, 457 F.2d 904, 907 (8th Cir. 1972); *see also* Universal Camera Corp. v. NLRB, 340 U.S. 474, 484, 71 S.Ct. 456, 95 L.Ed. 456 (1951). And, as we have previously stated, "[c]ircumstances that merely raise a suspicion that an employer may be activated by unlawful motives are not sufficiently substantial to support a finding." NLRB v. Ace Comb Co., 342 F.2d 841, 848 (8th Cir. 1965).

■■ We have held that it is impossible for a discharge to be discriminatory without proof that the employer had knowledge of the employee's union activities, Amyx Industries, Inc. v. NLRB, *supra*, 457 F.2d at 906; NLRB v. Ace Comb Co., *supra*, 342 F.2d at 848, and the Board always has the burden of

proving such knowledge with substantial evidence. Amyx Industries, Inc. v. NLRB, *supra*; NLRB v. Melrose Processing Co., *supra*, 351 F.2d at 697. An exception to this rule is where the Board proves that the discharge was motivated by the employer's belief or "suspicion" that the employee was engaging in union activities, notwithstanding the absence of actual participation. NLRB v. Clinton Packing Co., Inc., 468 F.2d 953, 955 (8th Cir. 1972); NLRB v. Ritchie Manufacturing Co., 354 F.2d 90, 98 (8th Cir. 1966). However, the burden of proof is unchanged; the Board must prove by substantial evidence that the real reason for the discharge was the employee's suspected union activity.[7]

It is not disputed that Hill could have been lawfully discharged because of his S.O.B. comment. We have consistently held that an employer may discharge an employee for good reason, bad reason or no reason at all, so long as the discharge is not motivated by unlawful considerations. NLRB v. Century Broadcasting Corp., 419 F.2d 771, 778 (8th Cir. 1969); NLRB v. Arkansas Grain Corp., 392 F. 2d 161, 167 (8th Cir. 1968); NLRB v. Ace Comb Co., 342 F.2d 841, 847 (8th Cir. 1965); Fort Smith Broadcasting Co. v. NLRB, 341 F.2d 874, 879 (8th Cir. 1965). We stated in NLRB v. Ace Comb Co., *supra*:

> [O]nce it is determined that disciplinary action is warranted the extent of the action taken is purely within the discretion of the employer, and the Board may not substitute its judgment for that of the employer.
> 342 F.2d at 847.

■ We must conclude from the whole record that the Board's findings were the result of speculation unsupported by evidence, direct or circumstantial, sufficient to raise such speculation to the level of a reasonable inference of illegal conduct. We give deference to

---

7. The fact that the company chose not to present any evidence has no effect on the Board's burden of proof, and no inferences of wrongdoing can be drawn from the company's failure to disclaim the Board's allegations. NLRB v. Century Broadcasting Co., 419 F.2d 771, 776–777 (8th Cir. 1969).

269

the Board's ability to draw rational conclusions from the evidence, but in this case the conclusions are not supported by substantial evidence. S. W. Noggle Co. v. NLRB, 478 F.2d 1144 (8th Cir. 1973).

Application for enforcement is denied.