## No. 16,939.

BENNETT'S RESTAURANT *v.* INDUSTRIAL COMMISSION ET AL.

(256 P. [2d] 891)

Decided March 23, 1953. Rehearing denied April 27, 1953.

Mr. L Bernard Davis, Mr. B. F. Napheys, Jr., for plaintiff in error.

Mr. Duke W. Dunbar, Attorney General, Mr. H. Lawrence Hinkley, Deputy, Mr. Peter L. Dye, Assistant, for defendant in error Industrial Commission.

Messrs. Graham & Scheunemann, for defendant in error, Hotel and Restaurant Employees, Local Union No. 14, A. F. of L.

*En Banc.*

Mr. Chief Justice Stone delivered the opinion of the court.

Defendant in error, hereinafter referred to as the Union, filed complaint before the Industrial Commission as the Union representing employees concerned, alleging that respondent, plaintiff in error, while engaged in the restaurant business, violated section 6 (1) (a) and (c) of the Labor Peace Act, in that it discharged eight named employees because of, and to discourage their activities in, the Union, and restrained and coerced its employees in their exercise of rights guaranteed by said Act. The matter came up for hearing before a referee who entered findings of fact favorable to respondent and ordered denial and dismissal of the complaint. Thereafter, upon petition for review by complaintant, the case was referred to the Commission which made findings as follows:

"The Commission finds from the evidence that the discharged persons, to wit, Norma I. Sparks, Jean Harding, Bessie Deem, and Kay Benson were outspokenly in favor of unionization, and that although their services

were otherwise satisfactory they were discharged whereas other waitresses who had been in respondent's employ for shorter periods of time had been retained.

"The Commission is of the opinion and so finds that as to these four waitresses respondent was discriminatory and in violation of Section 6 (1) (c) of the Colorado Peace Act of 1943." Accordingly, the Commission vacated the referee's order, and ordered that respondent forthwith offer reemployment to said four employees and reimburse each of them for any financial loss suffered by reason of discharge. Respondent filed petition for review and the Commission affirmed and approved its prior award.

Respondent thereupon sought review of the findings and awards of the Commission in the district court on the grounds that the findings of fact were not in accordance with the evidence and that the award was not supported by the findings of fact. Upon issue joined, both by the Commission and the Union, and after hearing to the court, the award of the Commission was by it affirmed, and Respondent has brought the matter here for review on the ground of insufficiency of proof to support the order and award of the Commission.

It appears from the record that immediately prior to April 12, 1951, the date of the discharge of the waitresses here challenged, Mr. Bennett, the owner of the respondent corporation, discontinued breakfast service and closed the restaurant at eight-thirty instead of nine o'clock in the evening. This change terminated his need for his breakfast waitresses, and resulted in the discharge of those in whose behalf this proceeding was brought.

While there was lengthy argument by petitioner supporting its contention that the closing down of the breakfast shift was for the purpose of intimidating employees from participating in union activities, the finding of the referee was to the contrary, there was no finding of the Commission on that issue, and we find nothing in the

record to require our holding that such discontinuance of the breakfast shift was ordered for any reason other than an attempt to avoid losses and put the business on a better financial basis.

The Colorado Labor Peace Act, chapter 131, Session Laws of Colorado 1943, section 6, page 400, provides: "(1) It shall be an unfair labor practice for an employer individually or in concert with others: (a) To interfere with, restrain or coerce his employees in the exercise of the rights guaranteed in Section 4.

\* \* \*

"(c) To encourage or discourage membership in any labor organization, employee agency, committee, association or representation plan by discrimination in regard to hiring, tenure or other terms or conditions of employment; \* \* \*."

█ Under the statute, the only remaining question to be resolved was whether, in discharging waitresses, as a result of closing the breakfast shift, all or any of them were selected for discharge by reason of their union activities, rather than of seniority, acceptable service, or other reason not based upon or prejudicial to union activities of the employees, in violation of said statutory provision.

We may say of our Act, as was said by the United States Supreme Court of the National Labor Relations Act, in *National Labor Relations Board v. Jones & Laughlin Steel Corp.*, 301 U. S. 1, 57 Sup. Ct. 615, 81 L. Ed. 893, 108 A. L. R. 1352: "The act does not interfere with the normal exercise of the right of the employer to select its employees or to discharge them. The employer may not, under cover of that right, intimidate or coerce its employees with respect to their self-organization and representation, and, on the other hand, the Board is not entitled to make its authority a pretext for interference with the right of discharge when that right is exercised for other reasons than such intimidation and coercion. The true purpose is the subject of investiga-

tion with full opportunity to show the facts. It would seem that when employers freely recognize the right of their employees to their own organizations and their unrestricted right of representation there will be much less occasion for controversy in respect to the free and appropriate exercise of the right of selection and discharge."

 Section 8, sub-section (3), of the Labor Peace Act provides that proceedings before the Commission shall be governed by the rules of evidence prevailing in courts of equity, and the party on whom the burden of proof rests shall be required to sustain such burden by clear and satisfactory preponderance of the evidence which is competent under such rules. Sub-sections 7 and 8 of said section, however, provide that upon hearing in the district court, under complaint for review of the Commission's order, "The findings of fact made by the Commission, if supported by credible and competent evidence in the record, shall be conclusive." Therefore the question to be resolved by us is whether the findings made by the Commission are supported by any "credible and competent evidence in the record." It was the province of the Commission, and not of the court, to determine its weight. *Century Building Company, Inc., v. Wisconsin Employment Relations Board,* 235 Wisc. 376, 291 N. W. 305. In determining this question, the rule as to admissible evidence is well stated in 56 C. J. S., page 307, section 28(100): "In ascertaining whether an employee was discharged because of union activities the board may consider circumstantial, as well as direct, evidence, but when circumstantial evidence is relied on there must be evidence of circumstances from which the board may conclude with reasonable certainty that the employee was discharged because of union activity. The board may draw inferences from the facts proved. The fact that some of the evidence relating to a discriminatory discharge was hearsay affords no basis for objecting to the finding of the board. However, mere suspicion

or conjecture alone is not sufficient on which to base a finding of discriminatory discharge."

There was credible and competent evidence before the Commission of the following facts, inter alia: Some ten days before the discharge of the waitresses, a union organizer began an attempt to unionize respondent's restaurant. He gave a few of the girls cards to come down to union meetings, went to the restaurant every day, meeting the afternoon workers in the alley after they had finished work, and in the morning when they were not so busy, talking to the breakfast waiters over a cup of coffee inside. He also talked to the head waitress, Mrs. Glaub, who told him that Bennett would never be organized, and that the Union would never organize any place in the City of Denver. The waitresses most active in favor of organization were Jean Harding, Norma Sparks, Kay Benson, Bessie Deem, Mrs. Rhorback and Geneva McLaughlin. Mrs. Rhorback was discharged on April 10 for reason not challenged by the Union. Norma Sparks, Bessie Deem, Kay Benson and Jean Harding signed up for the Union; the others did not, although some of them on the afternoon shift belonged to unions in other cities. These four waitresses were active in talking to other waitresses and with the head waitress, urging unionization of the restaurant.

Bennett, the owner of the restaurant, was in Florida at the time of the discharge and testified that he had no knowledge of the efforts being made to unionize his shop and ordered the closing of the breakfast shift solely for financial reasons, with full authority on the part of the manager as to discharge and employment of waitresses. Behne, the manager, testified that he knew nothing about union activity, then later said, upon question as to whether he knew there was any union man around the place: "I didn't know directly. I heard that they had been in, but I hadn't been approached or seen them directly." Still later he testified: "Q. You had no information at all that the union was organizing at this

time? A. I had received none. Q. You had never heard it mentioned by anyone? A. No. Q. You had never seen anyone handing out leaflets, invitations to union meetings? A. Not within the building. Q. Outside the building? A. I had observed during the last week that they were passing out literature out of the building. Q. Then you did know there was a union organization— A. That's right."

Mrs. Glaub, the head waitress, did not testify, but the attempted unionization of the shop was known to her, as appears not only from the testimony of the organizer, but from that of several of the waitresses. Norma Sparks testified that Mrs. Glaub told her Mr. Bennett would definitely close before he would let the Union come in. Jean Harding testified that Mrs. Glaub told her that Mr. Bennett would allow Union members to work if they weren't active in the Union, but we wouldn't allow a Union in the place.

There is evidence that the four waitresses, Norma Sparks, Bessie Deem, Kay Benson and Jean Harding were all experienced waitresses. Norma had been employed since November 1950; Bessie since June 1950; Kay, first employed in June 1948, then after a year's absence reemployed in May 1950 and absent from January to March 1951 because of an operation; Jean employed only since March 1951. Kay had been employed since her operation on the afternoon shift, working from eleven until five, and had occasionally helped additionally through dinner. The other three were on the breakfast shift. None of them had ever been criticized or warned; all were discharged without any advance notice whatever; none of them could learn any reason for her discharge, and all desired further employment and would have accepted reemployment later had it been offered. After Norma's discharge she called the head waitress with regard to reemployment, but was told that there was no opening.

In determining what waitresses should be discharged,

the manager testified at first as to his reasons for discharge, then later said that he had asked Mrs. Glaub, the head waitress, to submit a list of waitresses she felt were outstanding and discharge was based on such list. Still again, he testified that he and the head waitress worked the list out together. Finally he testified that she was hiring the waitresses. This list was made up not only from the breakfast shift, but from the entire crew of around twenty-eight or thirty-two waitresses. There was a large turnover in waitresses. Advertisements were run regularly in the papers; waitresses were quitting frequently and new waitresses were being employed during February, March and April prior to the discharge of these waitresses on April 12. The manager testified with regard to certain of the girls whom he had not discharged, that if he had let one of them off because of discontinuance of some phase of the work and then found in the next few days that he needed a waitress, he would have given her a call. He was then interrogated as follows: "Q. Why haven't you called these girls? A. We haven't had an opening. Q. Haven't you testified that you have been hiring about three a month? A. We had employed about three girls— Q. You say there are no openings? A. No openings. Q. There were none when you filled these openings? A. No. Q. How could you have hired new girls when there was no opening? A. We were anticipating a bigger lunch business. Q. You hired them having no work for them to do? A. I wouldn't say there was nothing to do. Q. Then there were openings? A. There were openings. Q. Then why didn't you call these girls? I believe you testified that you would recall them if you had an opening and then you said that you had openings. Now, I want to know why you didn't do as you said you would. Did you call them? A. I left those instructions with Mrs. Glaub. Q. Why didn't she call them? A. That I don't know. She is hiring the waitresses." He also testified regarding the list of "outstanding" waitresses: "Q. Now, the

names of none of those who were released were on that list? A. That's right. Q. The names of the others whom you have been hiring during February, March and April, were all on the list? A. Well, they are all on the list, but as I say, some of those girls were hired in February and of course it would be pretty hard to say during that time— Q. The same, I think you said was true in March? A. Probably. Q. They were all outstanding? A. I would say those she kept on the payroll were."

█ It is apparent that the discharge of the four waitresses was not on the basis of seniority for the reason that other junior employees were retained. It was not on the basis of their being on the breakfast shift, as one of them was on the afternoon shift, while at least two other waitresses, then on the breakfast shift, were retained, and the manager testified that in making up the list of "outstanding" employees to be retained he included all the waitresses regardless of shift. The claim that the selection was made on the basis of waitresses who were "outstanding" might well not have been believed by the Commission, since some of those retained had been employed for less than a week, and the manager himself admitted their capability could not be determined in that time. Further, the manager gave other reasons for their being discharged, based on asserted facts not consistent with his admission that none of them had been criticized or told of the asserted objections, and further inconsistent with the testimony of the waitresses which the Commission was at liberty to accept in place of the self-contradictory testimony of the manager. In the light of such a record, and the testimony that the waitresses discharged were those and only those who had signed up for the Union, we think by the elimination of all other reasonable grounds for discharge, the Commission could conclude with reasonable certainty that the true reason for discharging these waitresses was their union activities, and that the purpose

of it was to discourage the unionization of the restaurant. It appears from the testimony that this purpose was accomplished.

██ It appearing that there was credible and competent evidence to support the findings of the Commission, its award and the judgment of the trial court must be and is affirmed.

MR. JUSTICE ALTER and MR. JUSTICE CLARK dissent.

MR. JUSTICE HOLLAND does not participate.