MID-PLAINS EDUCATION ASSOCIATION, AN UNINCORPORATED ASSOCIATION, APPELLEE, V. MID-PLAINS NEBRASKA TECHNICAL COLLEGE, NORTH PLATTE, NEBRASKA, APPELLANT.

199 N. W. 2d 747

Filed August 4, 1972. No. 38291.

Maupin. Dent, Kay, Satterfield, Girard & Scritsmier and Kem W. Swarts, for appellant.

Crosby, Pansing, Guenzel & Binning and Theodore L. Kessner, for appellee.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, SMITH, McCOWN, NEWTON, and CLINTON, JJ.

White, C. J.

In this labor relations case the plaintiff labor organization alleged that five of its members, including all of its officers, were wrongfully discharged by the defendant because of labor organization activity. The Court of Industrial Relations found for the plaintiff and ordered reinstatement. We affirm the judgment of the Court of Industrial Relations.

The plaintiff, to which we will hereinafter refer as the Association, was formed in the fall of 1970 by members of the faculty of the defendant college. One of its purposes was to represent its members in collective negotiations with the Board of Governors of the college. On November 15, 1970, the Association formally requested recognition as the bargaining agent of the faculty and negotiations concerning working conditions. The Board of Governors rejected this request on December 15, 1970. On January 25, 1971, the Association filed a petition in the Court of Industrial Relations, invoking the court's jurisdiction to resolve the dispute concerning representation and negotiations. Hearings on the petition were held by the Court of Industrial Relations on March 8 and April 24, 1971, and the matter was taken under advisement by the court. On May 5, 1971, the Board of Governors, without prior warning, announced that the contracts of six teachers, five of whom are involved in this suit, would not be renewed for the next school year. The Association subsequently filed an application with the Court of Industrial Relations asking for reinstatement of five of the teachers. A hearing was held, and an order of reinstatement was issued from which the college takes this appeal.

The college first contends that the Court of Industrial Relations lacked jurisdiction to issue the order of reinstatement because the petition was filed by the Association and not by the affected teachers. Stripped of its rhetoric this is akin to a defendant arguing that the court had no jurisdiction over the plaintiff, an argument

which the defendant clearly has no standing to make.

We are satisfied that the procedure in bringing this petition properly invoked the jurisdiction of the Court of Industrial Relations. Section 48-837, R. S. Supp., 1969, provides in part: "Public employees shall have the right to be represented by employee organizations to negotiate collectively with their public employers in the determination of their terms and conditions of employment, and the administration of grievances arising thereunder * * *." Section 48-811, R. S. Supp., 1969, provides in part: "Any * * * labor organization * * * when any industrial dispute exists between parties as set forth in section 48-810, may file a petition with the Court of Industrial Relations invoking its jurisdiction * * *." These statutes make it quite apparent that in a dispute such as this, a labor organization may invoke the jurisdiction of the Court of Industrial Relations in behalf of its affected members.

Article XV, section 13, of the Nebraska Constitution, provides: "No person shall be denied employment because of membership in or affiliation with * * * a labor organization * * *." Section 48-837, R. S. Supp., 1969, provides: "Public employees shall have the right to form, join and participate in * * * any employee organization of their own choosing * * *." Section 48-811, R. S. Supp., 1969, provides: "No adverse action by threat or harassment shall be taken against any employee because of any petition filing by such employee * * *." These constitutional and statutory provisions do not interfere with an employer's ordinary powers over his employees except to this extent: If the employee can demonstrate that adverse action against him was motivated by a desire to discourage or retaliate for union membership or activity, the action is unlawful. The college vigorously contends that these teachers were employed on 1-year contracts, and that it was under no obligation to rehire them and acted well within its rights in failing to do so. This does not preclude consideration

of the motive of the college. A failure to rehire is a denial of employment and an adverse action against an employee, just as an outright firing would be, and if it is prompted by anti-union motives, it comes within the prohibitions of the Constitution and the statutes. The relevant consideration is the motive of the employer. The Court of Industrial Relations succinctly and correctly stated the law: "An employer's action or non-action which results in cessation of an employee's employment is unlawful if the employer's motive in so doing is to discourage union membership or activity, or in reprisal or retaliation for the latter activities." See Annotation, 83 A. L. R. 2d 532.

Before examining the facts upon which this decision is based, it is appropriate to discuss the scope of our review. An appeal from the Court of Industrial Relations is triable de novo in this court. §§ 25-1925 and 48-812, R. R. S. 1943. This does not mean that we are powerless to examine the conclusions of fact in the lower court. Wiese v. Klassen, 177 Neb. 496, 129 N. W. 2d 527. This court has held many times that even when the case is triable de novo, the superior position of the original trier of fact is to be respected and accorded great weight. See, Keenan v. Keenan, 187 Neb. 686, 193 N. W. 2d 568; Parkhurst v. Parkhurst, 184 Neb. 687, 171 N. W. 2d 243. This rule is particularly appropriate where something as subjective as motivation is in question.

The college justified its failure to rehire the teachers in question on the grounds that two of them had received bad evaluations, and that the other three had had their jobs eliminated by a curriculum change. Both of these grounds appear adequate on their faces, but it is clear that the college cannot hide behind them if its real motive was to retaliate for union activity. Upon an examination of the facts we must concur in the conclusion of the Court of Industrial Relations that these justifications do not ring true.

Both of the teachers who received poor evaluations

had been rehired with commendations in previous years, and neither had been specifically warned about his shortcomings or given an opportunity to correct them. One of them was head of his department, a position of some importance, and the other apparently was about to be promoted to that position. There was evidence of personality clashes involving these teachers and the administration, but not all of these seem to have arisen during the 1970-71 school year. What appears, then, is the administration on one hand, commending the work of these teachers, and entrusting positions of responsibility to them, and on the other hand giving them very poor evaluations. The evidence shows nothing to resolve this ambiguity. Further, the college president and other administration officials did not recommend to the Board of Governors that these teachers be dismissed, told that body that it could work with these teachers, and expressed surprise when they were not rehired. It seems highly unlikely that the Board of Governors, which does not deal with the faculty on a day-to-day basis, would in these circumstances take it upon itself to dismiss these teachers, unless other factors, unrelated to the evaluations, were at work.

The curriculum change which purportedly eliminated the jobs of the other three teachers is not credible. The college is a vocational school, and its curriculum includes courses of both a practical and a more theoretical nature. As we understand it, a student studying welding would go to an instructor who would teach him the mechanical aspects of how to weld. This instructor is called a "major area instructor." Our hypothetical welding student would also attend classes in which the instructor would teach the scientific and mathematical principles which a welder needs to know. These instructors are called "related area instructors." The proposed curriculum change would eliminate the related area instructors and provided that their functions would be taken over by the major area instructors. Under this

plan, the other three teachers would lose their jobs. On its face this plan seems reasonable and well within the discretion of the college. However, the extreme speed with which the plan was promulgated and the fact that no one on the faculty, including the department heads, had been told about it, forces us to the conclusion that it was merely a pretext for the dismissal of these three teachers.

The college attempted to show that this change had long been contemplated, but its evidence is not convincing. The change was the brainchild of Mr. Kenneth Aten, the college president, and several people testified that Mr. Aten had discussed the matter with them long previously. Obviously Mr. Aten himself is the best authority on what he was thinking about, but the record shows that he was present in court throughout the reinstatement hearing, and was not called upon to testify. This may be explained by Mr. Aten's testimony at one of the prior hearings on the subject of recognition, held April 24, 1971. At that hearing the following exchange took place: "Q. Mr. Kessner asked you about the teachers, are there any of the teachers from 6 down through 19 (the question refers to an exhibit containing a numbered list of faculty members) that are not coming back next year, that have resigned? A. The only resignation I know of so far is John McBride, number 14." If Mr. Aten had been planning a curriculum change at that time, he would have known that some of the related instructors' jobs would be eliminated, and that they would not be back. He could not truthfully have answered this question in the way he did if he had been planning the change at that time. Yet only 10 days later, May 5, 1971, the curriculum change was presented as "fait accompli." It is incredible that in the ordinary course of school administration a curriculum change of this magnitude would be implemented so rapidly and with no notice to anyone. In the April 24th hearing, the college took the position that some of the depart-

ment heads were more properly designated as administrative personnel, rather than faculty, and thus should not be included within the membership of the union. To fortify this position, evidence was presented emphasizing the importance of the department heads in the planning of the curriculum. We are now asked to believe that a major curriculum change was considered and adopted without these department heads even knowing about it. We cannot but agree with the Court of Industrial Relations that the plan was not bona fide.

In casting about for another explanation for the failure to rehire these teachers, we are irresistibly drawn to a clear and frankly expressed antipathy toward this labor organization on the part of the Board of Governors and the administration of the college. The witnesses representing these bodies made no attempt to conceal their disinclination to deal with the Association. They were not accustomed to dealing with unions; they were apprehensive at the prospect of negotiating with an experienced labor representative; and they feared the increase in influence which the faculty might achieve through this union. In the light of this antipathy, we turn to the action taken by the college. Six teachers were not rehired; and all six were members of the Association. All of the officers and organizers of the Association were not rehired. All nonmembers of the Association were rehired. Although some Association members were rehired, their numbers were so few that the Association could no longer make a credible claim to be the bargaining agent for the entire faculty.

In the light of these facts we are convinced that the failure to rehire was motivated by an unlawful intent to discourage and retaliate for labor organization membership and activity. We cannot improve upon the conclusion of the Court of Industrial Relations in its quotation from the Supreme Court of the United States: "It would seem that when employers freely recognize the right of their employees to their own organizations and

their unrestricted right of representation there will be much less occasion for controversy in respect to the free and appropriate exercise of the right of selection and discharge." Jones v. Laughlin Steel Corp., 301 U. S. 1, 57 S. Ct. 615, 81 L. Ed. 893.

The judgment of the Court of Industrial Relations is correct and is affirmed.

AFFIRMED.

SPFNCER, J., dissenting.

I respectfully dissent from the majority opinion herein. The opinion fails to recognize that the teachers involved were not on tenure, but were hired on 1-year contracts. They were not discharged but simply were not rehired for an additional year when their existing contracts expired.

An employer should have an absolute right to refuse to renew a contract, regardless of his reasons, unless tenure is involved, See Board of Regents v. Roth (Wis.), 40 Law Week 5079. The majority opinion, carried to its logical conclusion, will permit employees under short-term contracts, to make those contracts permanent ones regardless of the wishes of the employer. At the very least, an employee can force the employer to litigate every refusal to renew a contract.

NEWTON, J., dissenting.

I dissent. See dissent appearing in School Dist. of Seward Education Assn. v. School Dist. of Seward, 188 Neb. 772, — N. W. 2d —.