NEBRASKA DEPARTMENT OF ROADS EMPLOYEES ASSOCIATION, AN UNINCORPORATED ASSOCIATION, ET AL., APPELLANTS AND CROSS-APPELLEES, V. DEPARTMENT OF ROADS, STATE OF NEBRASKA, APPELLEE AND CROSS-APPELLANT.

205 N. W. 2d 110

Filed March 9, 1973. No. 38617.

Marti, Dalton, Bruckner, O'Gara & Keating and Douglas Marti, for appellants.

Clarence A. H. Meyer, Attorney General, and James J. Duggan, for appellee.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, SMITH, McCOWN, NEWTON, and CLINTON, JJ.

WHITE, C. J.

This is an appeal from a judgment of the Court of Industrial Relations of the State of Nebraska dismissing, on jurisdictional grounds, an action by the Nebraska Department of Roads Employees Association and by Richard Kiernan, a member of that organization. This action was commenced following the discharge from employment of the plaintiff, Richard Kiernan, by Thomas D. Doyle, Director-State Engineer of the Department of Roads, on September 8, 1971. The Court of Industrial Relations decided the controversy on jurisdictional grounds, found that the issue involved did not constitute an "industrial dispute" within the meaning of section 48-810, R. S. Supp., 1972, and that therefore the court was without jurisdiction, and dismissed the petition. We affirm the judgment of dismissal by the Court of Industrial Relations.

In order to understand the precise issue involved in this case, it is necessary to narrate the general background of the controversy and the development of the tension or friction between the plaintiff Kiernan and Thomas D. Doyle, the State Engineer, from the month of January 1971.

In January of 1971 the plaintiff Kiernan became interested in forming an employees' organization within the Department of Roads. He began by distributing a petition around the central complex of the department in order to determine how many of his coworkers would be interested in joining such a union. Donald O. Swing, one of Mr. Kiernan's immediate superiors, learned of these organizational efforts and reported them to the administrative deputy state engineer, Roy Gardner. By February of 1971 the matter had come to the attention of State Engineer Doyle.

Between April of 1971 and August 1971 the plaintiff Kiernan actively participated in the affairs of the fledgling union, acting first as chairman of the "Steering Committee for the Formation of the Department of Roads

Employees Association," then as chairman of the "Constitutional Committee," and finally as chairman of the "Board of Directors" of the association. During this period Doyle was kept advised of the public activities of the union. A copy of each published notice or information letter to be circulated among the employees was delivered to Doyle's office by Kiernan marked "Mr. Doyle: For your information. Richard Kiernan."

The first confrontation between Doyle and Kiernan concerned a flier announcing the first organizational meeting of the association to be held on April 16, 1971, in the cafeteria of the Department of Roads central building. Kiernan was called into Doyle's office and was told that the association could not have the use of the cafeteria for the purpose of holding its meeting because, Doyle said, the notice specifically provided that no personnel with a rating of Grade V engineer or higher could attend, and that under the circumstances he could not allow such a meeting to be held. Doyle testified that he was not sure whether he had the right to allow a closed meeting to be conducted on state property.

At this same meeting Doyle advised Kiernan that the organization did not have permission to post its notices on the departmental bulletin boards, but that permission would be granted in individual situations if supervisory personnel were given an opportunity to examine the notices prior to posting. The organization chose not to post its newsletters or notices rather than submit to supervision, and all subsequent notices bear the legend "NOT FOR BULLETIN BOARD POSTING." Deputy state engineer Roy Gardner testified that Doyle prohibited such posting because to permit it "would have opened it up for any type organization to come out and make use of a bulletin board, he didn't want to give them the right and deny others."

In the ensuing months a series of meetings took place between Doyle and Kiernan. In August 1971 Kiernan was called into Doyle's office and questioned concern-

ing one of the constitutional committee's information letters. The letter, in urging department employees to join the new association, contained the following: "In ALL categories except one, Nebraska was below average. THE ONE EXCEPTION BEING THE OFFICE OF STATE ENGINEER. Nebraska did not rate better than 35th in any category and rated in the 40's in 16 categories." Doyle was sufficiently concerned by this newsletter that he prepared a rebuttal in the form of a comparison of the salaries of most of the fifty state highway department heads, and based it upon more recent information than that contained in the newsletter. Furthermore, Kiernan was called into Doyle's office and asked whether he had considered how this would affect his future with the Nebraska Department of Roads, or something to that effect.

On August 12, 1971, Doyle issued a memorandum to all employees of the Department of Roads in which he alleged that the new association was spreading information "which implies that a new grievance procedure has been established within the Nebraska Department of Roads." He warned the employees that the only proper grievance procedures were those provided by the Personnel System rules, and that future statements or representations by the association in this vein "should be critically examined before employees rely upon them to the extent that their legal rights thereunder might be placed in jeopardy." On August 15, 1971, Kiernan was elected chairman of the board of directors of the N.D.R.E.A., and the constitution and by-laws of that organization were adopted.

The controversy between Kiernan and Doyle finally came to a head in late August and early September of 1971. On August 28, 1971, Kiernan attended a meeting of the Professional Engineers in Government Section of the Professional Engineers of Nebraska. This was a closed meeting, and no press representatives were invited or present, nor was any publicity intended. At

one point in the meeting, after a discussion of the proper role for P.E.G. in future political appointments, Larry Brown, a Department of Roads employee, asked what P.E.G. intended to do about the State Engineer's situation. W. R. Meyer, Jr., chairman of the meeting, expressed the opinion that perhaps P.E.G. should have made some recommendations or taken some action at the time of the appointment, but that it was too late to take any such action now. Kiernan then stood up and commented that he felt Doyle was not qualified to hold the post of State Engineer, but agreed that it was probably too late to do anything about it at the time. According to Mr. Meyer, the entire discussion involved no more than 5 minutes, and Kiernan made no more comments at the meeting concerning Doyle.

Doyle learned of Kiernan's comments through Eldon Green, a personal friend of Doyle's who had attended the meeting. Doyle admits that neither Kiernan nor anyone else gave any publicity to the remarks made there.

On September 1, 1971, W. R. Meyer, Jr., was summoned to Doyle's office and asked if Kiernan had questioned Doyle's qualifications at the P.E.G. meeting. After receiving an affirmative reply, Doyle inquired whether Lyle Nelson or Russ Reinig, two other active members of the N.D.R.E.A., had said anything, to which Meyer replied that he did not believe so. Doyle mentioned no other names and never asked exactly what Kiernan said. Doyle indicated to Meyer that he was considering disciplinary action against Kiernan.

After a brief conference with Reinig, Doyle called Donald Swing, Kiernan's immediate superior, and asked him to accompany Kiernan and deputy state engineer Roy Gardner to his office. At the meeting, Doyle asked Kiernan if he had made the remarks in question and asked him if he would care to repeat or elaborate on such remarks. In answer to this question, Kiernan said, "I'll be honest, it is my contention that you're

not qualified to fill the position of Director-State Engineer, and it is my further contention that it was inappropriate for Governor Exon to have appointed you to that position." Kiernan made it clear that the opinion was based upon the fact that Doyle was not a civil engineer, and did not have the necessary education or experience to fill the job. No voices were raised during the discussion and there was nothing threatening or otherwise objectionable about Kiernan's demeanor.

Doyle told Kiernan that he did not believe Kiernan could conscientiously carry out his duties in view of his attitude, and at approximately 4:55 p.m. on that date he informed Kiernan that he was suspended as of 5 p.m. on that date. A letter of suspension was immediately prepared by Doyle. The letter recites the activities which took place at the meeting and advised Kiernan that the suspension would last until a final determination was made by Doyle within the next week to 10 days.

W. R. Meyer, Jr., testified that he went back to Doyle's office to inform him that Kiernan had not been the one to raise the subject of his qualifications at the meeting, but he arrived after the suspension had already taken place. He nonetheless advised Doyle of this fact, whereupon Doyle replied that it did not matter because Kiernan had already been suspended. Doyle never did inquire as to who brought up the subject.

Either late September 7th or early September 8th a letter of termination was sent to Kiernan by certified mail. The letter cited as reasons for the termination: "1. Direct insubordination 2. Conduct unbecoming a State employee 3. For the good of the classified service." On September 8th Doyle presented a speech to a Lancaster County Democratic luncheon which, as Doyle knew, was attended by local newspaper reporters. Even though it was unlikely that Kiernan had received formal notice of his termination, Doyle nonetheless announced his decision at the luncheon. Doyle went on to say

that "we can not afford obstructionists" in the Department of Roads and that "we are trying to identify (those persons who are not good, dedicated employees) to convince them of the administration's point of view or encourage them to seek employment elsewhere."

During the period after Kiernan's termination, Doyle made known his opinion that supervisory personnel should not belong to an organization such as the N.D.R.E.A., which also includes among its membership nonsupervisory personnel. During this period at least six supervisors who had been very active in the N.D.-R.E.A. resigned from the organization.

The basic controversy here is whether or not the dismissal of the plaintiff Kiernan by Doyle under the circumstances above set forth involved an "industrial dispute" within the meaning of section 48-810, R. S. Supp., 1972, which gives *jurisdiction* to the Court of Industrial Relations *only* when such industrial dispute is involved. Section 48-810, R. S. Supp., 1972, provides: "All industrial disputes involving governmental service, service of a public utility, or other disputes as the Legislature may provide shall be settled by invoking the jurisdiction of the Court of Industrial Relations." (Emphasis supplied.) From this language alone, it is clear that a uniquely personal termination of employment does not constitute an industrial dispute within the meaning of the statute. We are not called upon in this case to either explore or decide any possible close questions involving the precise meaning of the term "industrial dispute" in other factual contexts. The interest of a government employee in retaining his job can be summarily denied. It is a settled principle that government employment, in the absence of legislation, can be revoked at the will of the appointing officer. Jones v. Hopper, 410 F. 2d 1323 (1969), cert. den. 397 U. S. 991, 90 S. Ct. 1111, 25 L. Ed. 2d 399; Vitarelli v. Seaton, 359 U. S. 535, 79 S. Ct. 968, 3 L. Ed. 2d 1012. Consequently, we are presented in this case with only a ques-

tion of fact. The Court of Industrial Relations is an administrative agency within the purview of the Administrative Procedures Act. School Dist. of Seward Education Assn. v. School Dist. of Seward, 188 Neb. 772, 199 N. W. 2d 752. On review de novo of the findings of an administrative agency granted the power to determine and dispose of industrial disputes, this court is without authority to interfere with that power unless it has been abused. Stated otherwise, if there is evidence in the record to support the administrative agency's findings and its determination is not unreasonable or arbitrary, this court is without authority to interfere with its judgment. The plaintiff Kiernan argues that the statute requires that appeals to this court shall be "heard and tried de novo." This is a familiar contention and has long since been disposed of in the cases in this court involving appeals from administrative agencies. We have recently held that this statutory provision refers to the procedure on the trial of the appeal rather than the standards of judicial review determinative of the appeal. T & N P Co., Inc. v. Nebraska Liquor Control Commission, ante p. 708, 204 N. W. 2d 809; Mid-Plains Education Assn. v. Mid-Plains Nebraska Tech. College, ante p. 37, 199 N. W. 2d 747 (1972); Keenan v. Keenan, 187 Neb. 686, 193 N. W. 2d 568 (1972); City of Lincoln v. Nebraska Liquor Control Commission, 181 Neb. 277, 147 N. W. 2d 803.

We again briefly review the pertinent evidence with relation to whether the determination of the Court of Industrial Relations is supported by the evidence. The evidence does disclose something more than the simple discharge of an employee by his superior. Of course, it is true, that there is no allegation that Kiernan's performance prior to the time he became involved in union activities was anything less than superior. But, as the court below noted in its findings and order, and as the evidence we have reviewed clearly demonstrates, there developed a substantial and apparently irreconcilable

personality conflict between Doyle and Kiernan. The court below said: "We do not analyze this evidence in detail nor reach a conclusion as to 'fault,' because interpreted most favorably to Mr. Kiernan it could only support the further inference that Mr. Doyle's letter purporting to remove Mr. Kiernan from his employment was motivated by *anti-Kiernan* animus rather than by anti-labor organization animus. It is clear that Mr. Kiernan gave no indication that he was acting or speaking for the Association when he did any of the things Mr. Doyle found offensive." (Emphasis supplied.)

We agree. We hold, as did the court below, that the discharge of Richard Kiernan from his employment from the State of Nebraska, Department of Roads, constituted a uniquely personal termination of employment and not an industrial dispute. The plaintiffs simply fail adequately to show reasons for the discharge other than the direct insubordination and a clear personality conflict between Doyle and Kiernan. Accordingly, the Court of Industrial Relations was correct in finding that it lacked jurisdiction over the subject matter of this action under section 48-810, R. S. Supp., 1972.

The same argument disposes of the plaintiffs' contention that Doyle's action in dismissing Kiernan violated rights guaranteed to Kiernan under Article XV, section 13, of the Constitution of the State of Nebraska, and section 48-837, R. S. Supp., 1972. The former provides: "No person shall be denied employment because of membership in or affiliation with, or resignation or expulsion from a labor organization * * *." The latter provides: "Public employees shall have the right to form, join and participate in * * * any employee organization of their own choosing." The finding by the Court of Industrial Relations that no antiunion animus was shown to have prompted Kiernan's dismissal dictated a finding that Kiernan had not been denied rights under either of these provisions. The two findings rest

on the same factual base, and were necessary to determine the jurisdictional issue.

Since the court below lacked jurisdiction over the subject matter it was correct in refusing to decide whether or not Kiernan was in fact guilty of insubordination, or whether other constitutional violations were present. It is elementary that where a court has no jurisdiction over the subject matter of the action, the proceedings in such action are void. Wolski v. Lippincott, 147 Neb. 944, 25 N. W. 2d 754 (1947).

Since we have found that the court below had no jurisdiction over the subject matter, it is unnecessary for us to consider the other issues raised on this appeal or the cross-appeal. The judgment is correct and is affirmed, and the cross-appeal is dismissed.

AFFIRMED.