**GENERAL DRIVERS AND HELPERS UNION et al., Appellant,**

v.

**BROWN COUNTY, a political subdivision of the State of South Dakota, acting by and through its duly elected Sheriff, et al., Respondents.**

**No. 11991.**

Supreme Court of South Dakota.

Sept. 7, 1978.

Harry H. Smith of Smith & Smith, Sioux City, Iowa, for appellant; Robert L. O'Connor, Sioux Falls, on brief.

Dennis Maloney of Maloney, Kolker, Fritz, Hogan & Johnson, Aberdeen, for respondents.

PORTER, Justice.

## CASE SUMMARY

The Division of Labor and Management Relations, South Dakota Department of Labor, after hearing, concluded that the Sheriff of Brown County had violated SDCL 3–18–3.1(1), (2), (3), and (6) when he discharged two deputy sheriffs on the pretext that they had driven sheriff's cars unauthorized miles and that they were not doing their share of the work when, in fact, his motivation for the discharge was his intent to interfere with public employee union activity authorized by SDCL 3–18.

The Division ordered the deputies reinstated with back pay and no loss of seniority benefits. The circuit court, on review under the Administrative Procedure Act, SDCL 1–26, reversed. On this appeal from

the circuit court judgment we reverse and remand for implementation of the Division order.

## FACTUAL BACKGROUND

David Jark and Frank Fryer were Sheriff's deputies of Brown County. Jark was hired in November 1974 and Fryer in July, 1975.

In August of 1975, Jark, Fryer, and deputy Robert Grass talked with the Sheriff about their interest in joining the General Drivers and Helpers Union, appellant here. The deputies complained that they were underpaid for the number of hours spent on the job.

On August 21, 1975, an organizational meeting for all deputies in the Sheriff's office was held at the Holiday Inn in Aberdeen to discuss unionization. The union business agent was present. Jark and Fryer acted as spokesmen. The agent announced that a number of Sheriff's deputies had indicated an interest by signing authorization cards. The Sheriff came to the meeting but left early.

The next day Sheriff's deputies working outside Aberdeen were terminated, but shortly thereafter were rehired.

At 4:30 p. m., September 9, 1975, the Sheriff called a meeting of all deputies. At the meeting he announced that Jark had 6,000 unauthorized miles and Fryer 2,800 unauthorized miles on the Sheriff's cars assigned to them. The Sheriff then announced that Jark and Fryer were discharged, effective immediately.

On September 19, 1975, appellant Union filed an unfair labor practice complaint with the South Dakota Department of Labor, Division of Labor and Management Relations. After hearing, the deputy director of the Division entered findings, conclusions and decision holding that the discharge of Jark and Fryer constituted an unfair labor practice under SDCL 3–18–3.1. On the appeal of Brown County, the circuit court reversed. The Union appeals from the judgment of the circuit court.

## ISSUE

This appeal presents the issue of whether there is substantial evidence on the record made before the Division from which the hearing officer could reasonably infer that the deputies were discharged in violation of the public employee union law, SDCL 3–18–3.1.

## DECISION

The Division concluded that when the Sheriff discharged deputies Jark and Fryer, he violated SDCL 3–18–3.1(1), (2), (3) and (6), which subdivisions provide:

It shall be an unfair practice for a public employer to:

(1) Interfere with, restrain or coerce employees in the exercise of rights guaranteed by law;

(2) Dominate, interfere or assist in the formation or administration of any employee organization, or contribute financial or other support to it; provided, an employer shall not be prohibited from permitting employees to confer with him during working hours without loss of time or pay;

(3) Discriminate in regard to hire or tenure or employment or any term or condition of employment to encourage or discourage membership in any employee organization;

. . . . .

(6) Fail or refuse to comply with any provision of this chapter.

When Division decisions are appealed, the court cannot substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. SDCL 1–26–36.[1] In the present case, the circuit court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative

1. SDCL 1–26–36 provided:

The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court

concluded that the termination was based on good and legitimate cause within the powers granted the Sheriff by statute; in its memorandum decision the circuit court stated that the decision of the Division was arbitrary and clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record. On appeal the County and the Sheriff contend that the judgment of the circuit court was correct because the decision of the Division was clearly an unwarranted exercise of discretion. The Union, on the other hand, argues that the ruling of the trial court should be reversed because there was substantial evidence in the record at the administrative hearing to support the decision of the Division.

■■■ Although we are dealing with an alleged violation of SDCL 3–18–3.1, we can look to the judicial interpretation of its federal counterpart, 29 U.S.C.A. § 158,[2] which is part of the National Labor Relations Act, for guidance in reaching our decision. *See In re Estate of Hobelsberger*, 85 S.D. 282, 181 N.W.2d 455 (1970). We recognize the statutory right of the Brown County Sheriff to remove deputies from his office at will when he so desires. SDCL 7–7–21.[3] His right to discharge deputies in his office is limited, however, by our statute giving public employees the right to form and join labor or employee organizations. SDCL 3–18–2.[4] Therefore, when there are two possible reasons for an employee's dis-

findings, inferences, conclusions, or decisions are:

(1) In violation of constitutional or statutory provisions;

(2) In excess of the statutory authority of the agency;

(3) Made upon unlawful procedure;

(4) Affected by other error of law;

(5) Unsupported by substantial evidence on the whole record; or

(6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

2. 29 U.S.C.A. § 158 provides:

(a) It shall be an unfair labor practice for an employer—

(1) to interfere with, restrain, or coerce employees in the exercise of their rights guaranteed in section 157 of this title;

(2) to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it: *Provided*, That subject to rules and regulations made and published by the Board pursuant to section 156 of this title, an employer shall not be prohibited from permitting employees to confer with him during working hours without loss of time or pay;

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: . . .

3. SDCL 7–7–21 provides, in part:

The officer in whose office such deputies or clerks are employed shall have the sole power of appointing the same or removing them at pleasure, which appointment or removal shall be by a certificate in writing, and any deputy or clerk so appointed shall before entering upon the duties of his office, take

and subscribe the oath or affirmation required by the Constitution, which oath or affirmation shall be endorsed on the certificate of appointment and filed as otherwise provided by law.

4. SDCL 3–18–2 provides:

Public employees shall have the right to form and join labor or employee organizations, and shall have the right not to form and join such organizations. Public employees shall have the right to designate representatives for the purpose of meeting and negotiating with the governmental agency or representatives designated by it with respect to grievance procedures and conditions of employment and after initial recognition by the employer, it shall be continuous until questioned by the governmental agency, labor or employee organization, or employees, pursuant to § 3–18–5. It shall be unlawful to discharge or otherwise discriminate against an employee for the exercise of such rights, and the governmental agency or its designated representatives shall be required to meet and negotiate with the representatives of the employees at reasonable times in connection with such grievance procedures and conditions of employment. The negotiations by the governmental agency or its designated representatives and the employee organization or its designated representatives shall be conducted in good faith. Such obligation does not compel either party to agree to a proposal or require the making of a concession but shall require a statement of rationale for any position taken by either party in negotiations. It shall be unlawful for any person or group of persons, either directly or indirectly to intimidate or coerce any public employee to join, or refrain from joining, a labor or employee organization.

charge, one valid and the other an unfair labor practice, the fact finder must look for the moving cause.

It has long been established that for the purpose of determining whether or not a discharge is discriminatory in an action such as this, it is necessary that the true, underlying reason for the discharge be established. That is, the fact that a lawful cause for discharge is available is no defense where the employee is *actually* discharged because of his Union activities. *A fortiori*, if the discharge is *actually* motivated by a lawful reason, the fact that the employee is engaged in Union activities at the time will not tie the employer's hands and prevent him from the exercise of his business judgment to discharge an employee for cause. *N. L. R. B. v. Ace Comb Company*, 342 F.2d 841, 847 (8th Cir. 1965).

In the present case the Division has the power to make the factual determination of discrimination. If the conclusions of the Division are based upon substantial evidence on the whole record, this court must accept them. Federal cases summarize the function of a court on review as follows:

It would indeed be the unusual case in which the link between the discharge and the union activity could be supplied exclusively by direct evidence. Intent is subjective and in many cases the discrimination can be proven only by the use of circumstantial evidence. Furthermore, in analyzing the evidence, circumstantial or direct, the Board is free to draw any reasonable inferences. As we stated in *Kitty Clover, Inc. v. N. L. R. B.*, 208 F.2d 212, 214 (8 Cir. 1953):

"The Board * * * is the judge of the facts, the credibility of the witnesses, and the weight of the evidence, and may draw inferences from circumstantial, as well as direct, evidence. It is only when the Board's determination is without adequate support in the evidence * * * that this Court may set aside an order or refuse its enforcement." *N. L. R. B. v. Melrose Processing Co.*, 351 F.2d 693, 698 (8th Cir. 1965).

We said in *Piper v. Neighborhood Youth Corps*, S.D., 241 N.W.2d 868, 869 (1976):

[I]n reviewing the circuit court's judgment under the APA this court must make the same review of the administrative tribunal's action as does the circuit court under SDCL 1–26–37. Furthermore, this court must make its decision as to whether the administrative decision can be sustained unaided by a presumption that the circuit court's decision is correct.

The mere fact of a discharge in and of itself warrants no inference that it was improperly motivated. *N. L. R. B. v. McGahey*, 233 F.2d 406 (5th Cir. 1956). At the heart of the analysis here, therefore, is the question of employer motivation. Guidelines for examining this question include:

1. Whether the employee had been criticized or specifically warned of his shortcomings;

2. Whether the employee was given any advance notice of his discharge;

3. Whether the employer offered economic benefits if the employee would refrain from union activity;

4. Whether the employer was opposed to unionization;

5. Whether the employee was competent;

6. Whether the employee was a known leader of the unionization drive and the employer knew of the employee's activity in the union at the time of the discharge;

7. Whether the discharge plan was promulgated with speed;

8. Whether the employer gave an implausible explanation for its action;

9. Whether the discharged employee was singled out for special treatment;

10. Whether the reasons for discharge given at the hearing were the same as those given to the employee at the time of the discharge.

See *McGraw-Edison Company v. N. L. R. B.*, 419 F.2d 67 (8th Cir. 1969); *N. L. R. B.*

v. *Frazier, Inc.*, 411 F.2d 1161 (8th Cir. 1969); *Kellwood Company, Ottenheimer Bros. Mfg. Div. v. N. L. R. B.*, 411 F.2d 493 (8th Cir. 1969); *N. L. R. B. v. Melrose Processing Co.*, 351 F.2d 693 (8th Cir. 1965); *Bennett's Restaurant v. Industrial Commission*, 127 Colo. 271, 256 P.2d 891 (1953); *Mid-Plains Ed. Ass'n v. Mid-Plains Neb. Tech. Col.*, 189 Neb. 37, 199 N.W.2d 747 (1972); *Ohland v. Dubay*, 133 Vt. 300, 336 A.2d 203 (1975). In order to determine whether the Division's conclusion has adequate support in the record, we must examine the circumstantial evidence and the inferences drawn therefrom with the help of the guidelines listed above. We will analyze the evidence pertaining to each of the deputies individually.

## DEPUTY FRYER

Frank Fryer began working as a deputy in the Brown County Sheriff's office on July 1, 1975. On September 9, 1975, at 4:30 p. m., the Sheriff called a meeting of all of his deputies and announced that Fryer's employment would be terminated at 5:00 p. m. that day because of unexplained mileage on his assigned vehicle. The following analysis is an application of the relevant evidence in the record to the guidelines listed above:

1) The record indicates that the only criticism Fryer ever received from the Sheriff pertained to an incident which occurred during Fryer's first week of employment. Fryer had allegedly threatened a member of the fire department that he might use his authority against the department. Fryer denied the allegation, and he heard nothing more about the incident until the administrative hearing on October 10, 1975, subsequent to his discharge.

2) Fryer was given no advance notice of his discharge. He was notified one-half hour prior to termination.

3) Prior to August 21, the Sheriff met with deputies Fryer, Jark, and Grass about joining the Union. The deputies wanted higher salaries and said they thought union representation would help them negotiate with the County Commissioners. The Sheriff told them that if they would wait until they got deputies in the outlying towns, he knew they could get more money. On August 25, the Sheriff had a letter prepared to the County Commissioners, which the deputies signed, stating they agreed to "forestall any further action with Union negotiations until we can meet with the Board of Brown County Commissioners for the purpose of discussing salary proposals, etc. It is desired to meet at the very earliest date possible." The Sheriff testified that he "thought they would just drop things and let us work with the Commission," and that he knew this could be done. *See N. L. R. B. v. Nabors*, 196 F.2d 272 (5th Cir. 1952).

4) On August 21, Fryer invited the Sheriff to a meeting sponsored by the Union at the Aberdeen Holiday Inn. The Union's business manager explained to the Sheriff that a number of the deputies had signed Union cards. At the administrative hearing the Union's business manager and Deputy Jark testified that the Sheriff left the meeting in an agitated state. Deputy Robert Grass also testified that at quitting time that afternoon he was called to meet with the Sheriff, Chief Deputy Kahl, and deputies Phyllis Biegler and Carroll Burckhard in the Sheriff's office. They inquired about the Union, and "It came up that if we were to go union we would probably not expect to find another job in the State of South Dakota with law enforcement." From this evidence it is logical to infer that the Sheriff was opposed to unionization.

5) At the time of his discharge Fryer had been a public servant for seventeen years, seven of those years as a firefighter and seven years as a deputy.

6) Fryer was one of the three deputies who met with the Sheriff in the summer about joining the Union. Fryer testified that he was the principal speaker at the meeting on August 21, which the Sheriff attended, and Fryer spoke in favor of joining the Union. At that meeting the Sheriff was informed that a number of his deputies had signed union cards. Also, the Sheriff testified that on August 25, when the letter was written to the County Commissioners,

he had already been advised by the deputies that they had signed union cards. From this evidence it is logical to infer that Fryer was a known leader of the unionization drive and the Sheriff knew of Fryer's union activity at the time of Fryer's discharge. *See N. L. R. B. v. Melrose Processing Co.*, supra.

7) On August 22, the day after the union meeting, all of the outlying deputy sheriffs were laid off, allegedly because of lack of funds. The Sheriff testified that he had informed the County Commissioners of the union activity in process. All of the laid-off deputies were reinstated on August 23. The Sheriff testified that he had absolutely no knowledge of the lay-offs until he read about them in the local newspaper on August 23. Deputy Phyllis Biegler testified that a survey of county mileage was done on September 9. That afternoon at 4:30 Fryer was told his employment would be terminated at 5:00. Thus, the discharge plan was promulgated with speed. *See McGraw-Edison Company v. N. L. R. B.*, supra.

8) The only reason given for Fryer's discharge at the 4:30 p. m. meeting on September 9, was that he had 2,800 unexplained miles on his car. When the Sheriff had instructed Fryer on the use of the car, he simply said that he wanted "honest miles" reported and cards filled out on every trip. Fryer was allowed to use the car for personal use, to drive it to and from work in the morning, for coffee breaks, at noon, after work, and for night duty. Fryer testified that he always asked before he used the car for anything other than duty. Fryer was never asked or given an opportunity to explain how he had acquired the additional miles, either before or after he was discharged.

9) In this case two deputies were discharged. Both of those deputies had actively promoted unionization. Although Deputy Grass had met with the Sheriff, Jark, and Fryer in the summer about union representation, he did not attend the August 21 organizational meeting. Grass was not discharged, but he testified that he was

afraid of losing his job, and that he believed that the firing of the other two deputies was an object lesson. Grass testified that the meeting on September 9 was the first time the Sheriff had called all of the deputies together and fired someone in front of them all. From this evidence it is reasonable to infer that Fryer was singled out for special treatment at variance from the normal routine in the Sheriff's office. *See N. L. R. B. v. Nabors*, supra.

10) Although the only reason given for Fryer's discharge on September 9 was the unexplained mileage on his car, at the hearing on October 10, the Sheriff also listed the threat made to a member of the fire department. Fryer had heard nothing about that threat since his first week of employment with the Sheriff's office.

If, upon review of the evidence analyzed above, we conclude that there was substantial evidence indicating that Fryer's "union activity . . . weighed more heavily in the decision . . . to fire [him] than did [the Sheriff's] dissatisfaction with [his] performance," *Marshfield Steel Company v. N. L. R. B.*, 324 F.2d 333, 337 (8th Cir. 1963), the ruling of the trial court must be reversed. Substantial evidence is defined by statute in South Dakota to mean "such relevant and competent evidence as a reasonable mind might accept as being sufficiently adequate to support a conclusion." SDCL 1–26–1(8). We conclude that pursuant to the analysis above, there was substantial evidence from which reasonable inferences could be drawn that Fryer's union activity weighed more heavily in the decision to fire him than did dissatisfaction with his job performance. "While each of these points is but a single block and alone might not be enough to support the finding of the [Division], when they are placed side by side these blocks form a sufficient foundation to support the finding of discrimination." *N. L. R. B. v. Melrose Processing Co.*, supra, 351 F.2d at 700.

## DEPUTY JARK

David Jark began working as a deputy in the Brown County Sheriff's office on No-

vember 5, 1974. Jark's employment was terminated on the same day and in the same manner as Fryer's. The following analysis is an application of the evidence in the record pertaining to Jark's discharge to the guidelines we have established.

1) The record indicates that Jark had conflicts with the Sheriff on two occasions during the ten months of his employment. On one occasion Jark was ordered to accompany townspeople on a tour of Aberdeen. Jark made it known to the Sheriff that he did not want to go, but when he realized that the Sheriff was angry with him, he went along. Another conflict arose when two deputies were assigned to drive in separate patrol cars, one to Yankton with a mental patient, and the other to Vermillion with one and one-half ounces of marijuana, on the same date. The Sheriff testified that his office policy was not to carry drugs and mental patients in the same automobile. Jark, on the other hand, testified that he had been told the Sheriff needed the additional mileage on the cars. Although Jark complained about two cars traveling to the same area of the state, he made the trip. Jark heard nothing more about the incidents until the hearing on October 10, 1975. He testified that until that date he was not aware of any complaints about his work, but rather had received compliments from the Sheriff several times, and thought he was doing quite well.

2) Like Fryer, Jark was given no advance notice of his discharge.

3) The evidence and analysis of whether the Sheriff offered economic benefits if Jark would refrain from union activity is the same as that given in the discussion of Fryer's discharge.

4) The discussion of whether the employer was opposed to unionization is also the same as that given in the analysis of Fryer's discharge.

5) Prior to his employment with the Brown County Sheriff's office, Jark had been employed as a reserve deputy sheriff in the County of Cochise, Arizona, for approximately one year, and was a certified deputy there for a year and a month. The county employed approximately forty-five deputies, who were required to complete 280 hours of training. He testified that he had more extensive training than that given in South Dakota, and was not required to attend the Officer School in South Dakota.

6) Jark testified that he was also one of the three deputies who met with the Sheriff in the summer about joining the Union, that he was one of the chief spokesmen at the organizational meeting on August 21, 1975, and that he expressed his personal opinion that he wanted to be represented by the Union. Therefore, the analysis of this point in the discussion of Fryer's discharge is applicable here, also.

7) Again, the discussion of this point is the same as that given to Fryer.

8) The only reason given for Jark's discharge at the 4:30 p. m. meeting on September 9, 1975, was that he had 6,000 unexplained miles on his car. Jark never received any written instructions on the use of the car, or on making reports on its use. He was merely instructed orally to report "honest miles," which were never defined. The Sheriff had informed him that he could take the car home and drive it to work. Jark testified that he did not at any time during his employment with the Sheriff's office use the Sheriff's car for personal business of any kind, unless he was first granted permission. Jark was never asked or given an opportunity to explain how he acquired the additional miles, either before or after he was discharged.

9) Jark was singled out in the same manner as Fryer. Therefore, the discussion of this point in the section on Fryer is also applicable here.

10) Although the only reason given for Jark's discharge on September 9, 1975, was the unexplained mileage on his car, at the hearing on October 10, 1975, the Sheriff also listed the incidents involving accompanying the tour of Aberdeen, and the trip to Yankton discussed in point one. Jark had heard nothing about those incidents since they had occurred.

Like our analysis of Fryer's discharge, we conclude that there was substantial evidence from which reasonable inferences could be drawn that Jark's union activity weighed more heavily in the decision to fire him than did dissatisfaction with his performance. *See Marshfield Steel Company v. N. L. R. B.*, supra, 324 F.2d at 337.

## CONCLUSION

It is often difficult to apply the general principles governing labor agencies and reviewing courts in discharge cases where there is some evidence tending to show that the employee's discharge was motivated by his union activities and other evidence tending to show that it was unrelated to his union activities. Judge (now Justice) Blackmun summed up the difficulties well in *N. L. R. B. v. Byrds Manufacturing Corporation*, 324 F.2d 329, 332–33 (8th Cir. 1963), when he stated:

These discharge issues are difficult and sensitive when termination coincides with union activity. The employee and the Board present plausible cause for continued employment—a good record, superior comparative production, recent change in assignment, lack of individual warning, and the like—and would tie his discharge solely to union sympathy or activity known to the employer. Management in turn presents equally plausible cause for the discharge—under-production, production not in line with ability, troublemaking, attitude, undesirable effect on fellow employees, similar contemporaneous discharges of non-union employees, and the like,—and would tie the discharge to time-honored and accepted management prerogatives wholly unrelated to union activity or sympathy . . . . The trier of fact must chose [sic] between these two. Again its decision, although always outrageous to the losing party and hard for it to accept, is, if supported by an adequate evidentiary basis, not to be retried by this court.

We also note our previous recognition that where "the legislature has created an administrative body empowered to deal with issues within its expertise, it is apparent that the courts must seek to harmonize their relations with these agencies." *Gottschalk v. Hegg*, S.D., 228 N.W.2d 640, 642 (1975). The United States Supreme Court expanded on this concept in *Radio Officers' Union v. N. L. R. B.*, 347 U.S. 17, 48–49, 74 S.Ct. 323, 340, 98 L.Ed. 455, 481–82 (1954), when it stated:

"An administrative agency with power after hearings to determine on the evidence in adversary proceedings whether violations of statutory commands have occurred may infer within the limits of the inquiry from the proven facts such conclusions as reasonably may be based upon the facts proven. One of the purposes which lead to the creation of such boards is to have decisions based upon evidential facts under the particular statute made by experienced officials with an adequate appreciation of the complexities of the subject which is entrusted to their administration. . . ." [citation(s) omitted] [I]t is permissible to draw on experience in factual inquiries.

 Although the employees bear the burden of demonstrating that they were discharged for the purpose of discouraging union activity, the Division may reject the employer's justification for the discharges on the basis of credibility alone. *See N. L. R. B. v. Walton Mfg. Co.*, 369 U.S. 404, 82 S.Ct. 853, 7 L.Ed.2d 829 (1962). There is ample evidence in this case from which the inference may fairly be drawn that the reason given for the discharge was a pretext to conceal the illegality involved in a discharge because of union membership. We therefore conclude that the circuit court erred in reversing the decision of the Division.

The Division ordered that Jark and Fryer be reinstated immediately to their respective positions as deputies, with no loss of seniority and fringe benefits that they might have accrued had they continued working through the date of reinstatement, and that they receive back pay from the date of discharge, September 9, 1975, at 5:00 p. m., until their date of actual rein-

statement. The judgment of the circuit court has been in effect since its entry, and the Division order has never gone into effect. We therefore remand this case to the circuit court with directions to remand the case to the Division to take evidence on the employment status of the deputies since their discharge and on the appropriate remedy under the circumstances. If appropriate, the deputies shall be offered immediate and full reinstatement to their former or substantially equivalent positions, without prejudice to their seniority and other rights and privileges. The deputies shall be compensated for any losses of pay they have suffered by reason of their discriminatory discharge, by paying them sums of money equal to that which they would normally have earned as wages in the Sheriff's office during the period from the date of discharge, September 9, 1975, less their net earnings from other employment during the back pay period. *See N. L. R. B. v. Gullett Gin Co.*, 340 U.S. 361, 71 S.Ct. 337, 95 L.Ed. 337 (1951). Whether reinstatement should be ordered, we leave to the sound discretion of the Division. *See Huffman v. Bd. of Ed. of Mobridge Ind. Sch. Dist., No. 13*, S.D., 265 N.W.2d 262 (1978).

All the Justices concur.